# In the United States Court of Federal Claims

No. 21-2317C

(Filed Under Seal: May 4, 2022)

(Reissued for Publication:  May 12, 2022)

_____

|  |  |
|---|---|
| **ENGLOBAL GOVERNMENT<br>SERVICES, INC.,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| **and** | ) |
| | ) |
| **KBR SERVICES, LLC,** | ) |
| | ) |
| *Defendant-<br>Intervenor.* | ) |

_____

*Alexander J. Brittin*, Brittin Law Group, PLLC, Washington, D.C., for Plaintiff.  Of counsel were *Mary Pat Buckenmeyer* and *A. Jonathan Brittin, Jr.*, Dunlap Bennett & Ludwig, PLLC.

*Shari A. Rose*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were *Adam J. Heer* and *Rachel M. Noble*, United States Defense Logistics Agency — Land and Maritime.

*Seth M. Locke*, Perkins Coie LLP, Washington, D.C., for Defendant-Intervenor.  With him on the briefs were *Julia M. Fox* and *Paul M. Korol*.

## OPINION AND ORDER[*]

*SOLOMSON*, **Judge.**

Following the buildup of the United States military during World War II, the federal government sought ways to coordinate logistics support across the armed forces.[1]  A postwar commission led by former President Herbert Hoover recommended a centralized system of logistics management; in the following decades, the military began to coordinate military support through various formal bodies, including a system of commodity manager agencies located within the various military branches.[2]  Eventually, the government established a single agency to coordinate logistics support — the Defense Supply Agency,[3] which in 1977 was officially renamed the Defense Logistics Agency ("DLA" or the "Agency").[4]  Today, DLA employs a staff of roughly 26,000, annually procures more than $41 billion in goods and services, and "manages the end-to-end global defense supply chain," coordinating a vast range of items ranging from medical equipment to construction material to petroleum products.[5]

In this post-award, bid protest-type action pursuant to 28 U.S.C. § 1491(b), Plaintiff, ENGlobal Government Services, Inc. ("EGS"), challenges the decision of Defendant, the United States, acting by and through DLA, to award a single firm-fixed-price indefinite-delivery, indefinite-quantity ("IDIQ") contract to Defendant-Intervenor, KBR Services, LLC ("KBR"), for the maintenance of automated fuel handling equipment ("AFHE") systems.  EGS objects to the award to KBR as arbitrary, capricious, and otherwise contrary to law.  The parties filed cross-motions for judgment on the

---

[*] Pursuant to the protective order in this case, the Court initially filed this opinion under seal on May 4, 2022, and directed the parties to propose redactions of confidential or proprietary information by May 11, 2022.  The parties have jointly submitted proposed redactions to the Court.  ECF No. 37.  The Court adopts those redactions, in part, as reflected in this public version of the opinion.  Words or phrases that are redacted have been replaced with [ * * * ].

[1] *History — Origins*, Defense Logistics Agency, https://www.dla.mil/AboutDLA/History/ (last visited Apr. 11, 2022).

[2] For example, "[t]he Army managed food and clothing; the Navy managed medical supplies, petroleum and industrial parts; and the Air Force managed electronic items."  *Id.*

[3] *Id.*

[4] *History — Growing*, Defense Logistics Agency, https://www.dla.mil/AboutDLA/History/ (last visited Apr. 11, 2022).

[5] *About the Defense Logistics Agency*, Defense Logistics Agency, https://www.dla.mil/AboutDLA/ (last visited Apr. 11, 2022).

administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons set forth below, the Court **GRANTS** the government's and Defendant-Intervenor's respective motions for judgment on the administrative record. The Court **DENIES** EGS's motion for judgment on the administrative record.

## I.   FACTUAL BACKGROUND[6]

### A. The Solicitation and Proposals

Seeking proposals for the maintenance of all AFHE[7] sites worldwide, DLA issued Solicitation SP4702-20-R-0014 on June 17, 2020 (the "Solicitation") as a request for proposals ("RFP"). AR 337–42; AR 1317 (Performance Work Statement) ("PWS"). The ultimate awardee would provide DLA with, among other things, all the personnel, equipment, materials, and services required to maintain its AFHE sites, which span from Japan to Greenland to Beaufort, South Carolina. AR 1317–18 (PWS). EGS is the incumbent contractor for the services sought.

The Solicitation anticipated awarding a single, fixed-price IDIQ contract with a one-year base period and four one-year options; the contract's guaranteed minimum value is $100,000 and its maximum value is $49,500,000. AR 345; AR 630 (§ M.1.4); AR 294 (Acquisition Plan). The Solicitation provided for the contract to be awarded pursuant to a best value tradeoff analysis, considering five factors: (1) Technical Approach (Factor 1); (2) Maintenance Program Management Approach and Personnel Qualifications (Factor 2); (3) Past Performance (Factor 3); (4) CyberSecurity (Factor 4); and (5) Price (Factor 5). AR 630 (§ M.2.1).

---

[6] This background section constitutes the Court's findings of fact drawn from the administrative record. Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005); *see also infra* Section IV. Citations to the administrative record (ECF No. 22, as corrected by ECF No. 23) are denoted as "AR" followed by the page number. Additional findings of fact are contained in Section V.

[7] The Solicitation explains that "the primary purpose" of the AFHE system is "to automate both transfer and inventory functions in order to reduce the risk of spills and leakage of petroleum products, thus reducing the risk of polluting the environment." AR 1317 (Performance Work Statement). The system "includes automation of valves, fuel transfer pumps, tank gauging, metering systems, and pipeline instrumentation." AR 1317.

Regarding price, the Solicitation established multiple fixed-price contract line item numbers ("CLINs").  AR 638.  Of particular relevance to this protest is CLIN 0001, "Transition-In Plan," which set "a 90 calendar day transition period" at the beginning of the contract in order to "minimize any decrease in productivity and to prevent possible negative impacts on additional services."  AR 1330 (PWS).  CLIN 0001 provided that throughout the 90-day transition, the "Predecessor Contractor" — in this case, EGS, *see* AR 4063 — was to "retain full responsibility for tasks and deliverables"; the awardee would assume responsibility only after the 90-day transition period.  AR 1330.  Accordingly, the Solicitation allowed offerors to propose no transition costs.  AR 626 (§ L.3.5.2.a.i) ("The Offeror may propose zero cost if there is no cost, however, the Offeror is responsible for providing all support required.").

The Solicitation further provided that "Factor 1 is significantly more important than Factor[s] 2, 3 and 4" and that the "non-price factors (Factors 1, 2, 3 and 4), when combined[,] are significantly more important than price."  AR 630 (§ M.2.2).  Consistent with a typical best value framework, the Solicitation provided that "[a]s the non-price ratings become more equal among proposals, the evaluated price becomes more important."  AR 630 (§ M.2.2).[8]  The government intended to conduct discussions.  AR 629 (§ M.1.2) ("The Government intends to hold discussions but reserves the right to make awards without discussion.").

The Solicitation established that the government would evaluate Factors 1 and 2 using a color-based and adjectival rating system.  AR 632 (§ M.3.2).  The government would evaluate Factor 3 with an adjectival "Performance Confidence Assessment."  AR 635 (§ M.3.3.6) (listing ratings ranging from "substantial confidence" to "no confidence" or "neutral confidence").[9]  The government was to evaluate Factor 4 via a binary "acceptable" or "unacceptable" rating method.  AR 637 (§ M.3.4).

---

[8] The Solicitation also provided that the Price factor ultimately could be dispositive:

> Accordingly, when Offerors are considered essentially equal in terms of technical capability, price may become the determining factor for award.  The Government reserves the right to award to a lower cost Offeror when the offers are considered essentially equal in terms of technical capability, or when specific strengths and/or benefits associated with a technically superior offer do not support the payment of any associated cost or price premium.

AR 629 (§ M.1.1).

[9] The Solicitation described three "aspects" within Factor 3 that would receive independent adjectival ratings — recency, relevance, and quality.  AR 633–35 (§§ M.3.3.1–3.3.6).  The ratings for these "aspects" ultimately rolled up into an overall "performance confidence assessment" for Factor 3.  AR 635 (§ M.3.3.6).

Finally, as explained below, the Solicitation required a price realism analysis as part of DLA's evaluation of Factor 5, Price. AR 637 (§ M.3.5) (providing that DLA may reject "[p]roposals which are unrealistic in terms of technical or schedule commitments, or unrealistically high or low in terms of cost").

## B.  Initial Submissions, Evaluation, and Award

DLA received timely proposals from three offerors: EGS, KBR, and Arseal Technologies, LLC. AR 2468 (Pre-Negotiation Briefing Memorandum).

In accordance with the Source Selection Plan, the Source Selection Team was comprised of a Source Selection Authority ("SSA"), a Source Selection Evaluation Board ("SSEB"), and a Procuring Contracting Officer ("PCO"). AR 311 (Source Selection Plan). The SSEB, in turn, was comprised of several independent evaluation teams, including: a Technical Evaluation Team ("TET") to evaluate Technical Approach and Maintenance Program Management Approach and Personnel Qualifications, a Past Performance Evaluation Team, a CyberSecurity Evaluation Team, and a Price Evaluation Team ("PET"). AR 311–315 (Source Selection Plan).

After evaluating the proposals, DLA established a competitive range — which included all three offerors — and conducted two rounds of discussions. AR 3616–20 (Price Negotiation Memorandum ("PNM")). The first round of discussions, which the government held via teleconference on September 23, 2020, involved both KBR and EGS. AR 3619 (PNM).

During this first round of discussions, and as relevant to this protest, the government advised EGS to lower several of its proposed cost elements. AR 1912 (EGS's Evaluation Notices ("ENs")). Specifically, the government advised EGS to: (1) lower its labor rate mark-up from [ * * * ]% to [ * * * ]%; and (2) lower its "Material, Travel, and [Other Direct Cost ("ODC")]" rates from [ * * * ]% to [ * * * ]%. AR 1912. In response, in EGS's Final Proposal Revision ("FPR"), EGS lowered its labor rate mark-up only to [ * * * ]%, not [ * * * ]%, and its Material, Travel, and Other ODC rates to [ * * * ]%, not [ * * * ]%. AR 2277–79 (EGS Response to ENs); AR 2573 (EGS FPR) (implementing EN responses and indicating "no changes to the [EN] response").

During discussions, the government also questioned EGS's proposed cost for CLIN 0001, Transition-In, given EGS's incumbency: "Looking at the CLIN 0001 (Transition In) cost, how was the $[ * * * ] calculated? . . . [T]he labor for transition seems high with no understanding of how that cost was calculated since *the contract transition should be minimal since EGS is the incumbent.*" AR 1912 (emphasis added); *see also* AR 626 (§ L.3.5.2.a.i) (providing, with respect to CLIN 0001, that offerors "may propose zero

cost if there is no cost"). EGS, however, chose to keep its transition cost in its FPR without any downward adjustment. AR 2280. EGS explained that its "transition-in period . . . is equal in price to ¼ of the first year['s] (12 months) costs for the contract" and that "[w]hile EGS is the incumbent contractor, we needed to bid this opportunity as though the transition-in period began at the end of the current maintenance contract." AR 2280.

On October 14, 2020, prior to accepting FPRs, the government held additional discussions with only KBR, as only KBR "had outstanding weakness[es], deficiencies, and uncertainties." AR 3620 (PNM). This second round was intended "to address unresolved questions regarding . . . how [KBR's] proposed costs were developed." AR 3623 (PNM).[10]

On November 2, 2020, EGS and KBR submitted their respective FPRs. AR 2573 (EGS); AR 2584 (KBR).[11] Arseal Technologies withdrew its proposal during discussions. AR 3618.

On December 9, 2020, the SSA finalized an initial decision summarizing the proposal evaluations. AR 2611–16 (SSA Decision ("SSAD") of December 9, 2020 ("First SSAD")). The SSA concluded that "both proposals demonstrated that the offerors understood the technical requirements of the performance work statement." AR 2615. The SSA summarized her rankings in a chart:

|  | **EGS** | **KBR** |
| --- | --- | --- |
|  | Rating | Rating |
| Factor 1:  Technical Approach | Good | Good |
| Factor 2:  Maintenance Program Management Approach / Personnel Qualifications | Good | Acceptable |
| Factor 3:  Past Performance |  |  |
| -    Recency of Prior Contracts | Very Recent | Very Recent |
| -    Relevancy of Prior Contracts | Very Relevant | Relevant |
| -    Quality of Products or Service | Good | Good |
| -    Performance Confidence Assessment | Satisfactory Confidence | Satisfactory Confidence |
| Factor 4:  CyberSecurity | Acceptable | Acceptable |
| Price | $46,749,493.71 | $38,109,181.90 |

[10] The Agency viewed KBR's responses as resolving the PCO's questions:  "KBR's pricing is understood and how their costs were calculated.  Mainly, KBR is proposing to have technicians be [ * * * ] in lieu of having [ * * * ]."  AR 2532 (PET Report of October 20, 2020).

[11] Although the administrative record refers to a "second round of negotiations," AR 3623, there was only a single set of FPRs requested and submitted.

AR 2615 (alterations underlined).

The SSA noted that the proposals were "essentially equal" for all but one of the non-price factors, remarked that as a result "the evaluated price has become more important," and described how KBR's unique technical approach lowered its price:

> In reviewing[] KBR's informal cost breakdown and narrative, they are proposing [ * * * ] their technicians in lieu of having technicians [ * * * ].   The solicitation did not require technicians [ * * * ] . . . . In addition, KBR's narrative indicated that . . . not having technicians [ * * * ], allows for lower costs [such] as not requiring [ * * * ].

AR 2614–15 (explaining that "EGS's proposal was 3.8% less than the [Independent Government Cost Estimate ("IGCE")] and KBR's proposal was 27.4% less than the IGCE"). The SSA concluded: "I do not believe it is in the Government's best interest to pay approximately $8 million more for the slight difference between the proposals with regard to the strength identified in EGS's proposal for Factor 2." AR 2615.

Accordingly, the SSA determined that KBR's proposal represented the best value to the government pursuant to the Solicitation and recommended KBR for award. AR 2616. The government awarded KBR the contract on February 9, 2021, AR 2655, and notified EGS of the award the same day. AR 2647.

### C. EGS's First GAO Protest

On February 22, 2021, EGS filed a protest with the Government Accountability Office ("GAO"). AR 3149. EGS alleged that DLA: (1) improperly evaluated various evaluation factors; (2) improperly evaluated the risk caused by KBR's proposed "capture" of EGS's non-professional workforce; (3) failed to conduct meaningful discussions and misled EGS into believing that lowering its price would make its proposal more competitive; (4) failed to evaluate price realism; and (5) conducted an improper tradeoff analysis and best value determination. AR 3149–85.

On April 2, 2021, EGS filed a supplemental protest with the GAO, adding allegations that DLA: (1) only conducted a price *reasonableness* analysis despite conceding the need for a price *realism* analysis; (2) disparately treated the proposals regarding CLIN 0001, Transition-In, and improperly ignored the offerors' different approaches to it; (3) unreasonably removed a weakness from KBR's proposal due to KBR's plan to hire incumbent EGS staff; (4) improperly converted the procurement into

a lowest price, technically acceptable ("LPTA") source selection; and (5) disparately treated the proposals regarding past performance.  AR 3341.

The GAO denied the protest on May 14, 2021.  AR 3467.  The GAO found, *inter alia*, that EGS's allegations regarding the non-price factors constituted mere "disagreement with the agency's evaluation."  AR 3473.  The GAO also concluded that many of EGS's arguments were "largely based on [its] belief that, as the incumbent contractor, its proposal merited the highest evaluation ratings."  AR 3470–71 (noting that "there is no requirement that an incumbent be given extra credit for its status as an incumbent").  Regarding EGS's allegations that DLA failed to properly evaluate KBR's low price, the GAO concluded that DLA "was aware of, and concerned about," KBR's price and took steps to address it, including during discussions.  AR 3473–74.

### D. EGS's First Court of Federal Claims Protest and DLA's Corrective Action

On May 24, 2021, EGS filed a complaint in this Court.  Complaint, *ENGlobal Gov't Servs., Inc. v. United States* (*EGS I*), No. 21-1388C (Fed. Cl. May 24, 2021), ECF No. 1.  EGS alleged virtually the same protest grounds as it did before the GAO.  *Id.* ¶¶ 63–165.  On June 7, 2021, EGS filed an amended complaint which alleged, for the first time, that DLA improperly evaluated EGS's proposal pursuant to FAR 52.222-46 ("Evaluation of Compensation for Professional Employees").  Amended Complaint ¶¶ 93–110, *EGS I*, No. 21-1388C (Fed. Cl. June 7, 2021), ECF No. 24.[12]

On July 7, 2021, the government filed a notice of corrective action.  Defendant's Notice of Corrective Action, *EGS I*, No. 21-1388C (Fed. Cl. July 7, 2021), ECF No. 30.[13]  The government represented that DLA "intends to amend [the Solicitation] to remove reference to FAR 52.222-46, which was inadvertently incorporated by reference in Section L."  *Id.* at 1.  The government also explained that offerors would be allowed "to submit revisions to the price proposals to the extent that removal of FAR 52.222-46 affects their price proposals" and that DLA would subsequently perform a new price evaluation and issue a new SSAD.  *Id.*

Later that same day, the Court held a telephonic status conference with the parties to discuss the government's proposed corrective action.  Minute Order, *EGS I*,

---

[12] FAR 52.222-46 is discussed in detail *infra* Section V.C.

[13] "A 'corrective action in the bid protest context' is an 'agency action, usually taken after a protest has been initiated, to correct a perceived prior error in the procurement process, or, in the absence of error, to act to improve the competitive process.'"  *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 986 n.1 (Fed. Cir. 2018) (quoting *Dellew Corp. v. United States*, 855 F.3d 1375, 1378 n.2 (Fed. Cir. 2017)).

No. 21-1388C (Fed. Cl. July 7, 2021).  Five days later, the government filed a notice informing the Court that DLA had "reconsidered its plans for corrective action." Defendant's Amended Notice of Corrective Action, *EGS I*, No. 21-1388C (Fed. Cl. July 12, 2021), ECF No. 32.  Citing "concerns raised by the Court and the parties during the status conference," the government made the following additional representations regarding its proposed corrective actions:

> DLA has determined that it will amend the solicitation to take corrective action to evaluate price proposals in accordance with FAR 52.222-46 and Sections L and M of the solicitation. DLA will afford offerors the opportunity *to submit a total compensation plan in accordance with FAR 52.222-46*. . . . DLA will then perform a new evaluation of offerors' proposed pricing, including preparing a new price evaluation team report, a new price negotiation memorandum, and a new price realism analysis.  Following its evaluation, DLA will issue a new source selection authority decision.

*Id.* at 1–2 (emphasis added).  The government also noted that neither EGS nor KGB had submitted a total compensation plan ("TCP") "with the supporting narrative and data required by FAR 52.222-46."  *Id.* at 2.

Accordingly, on July 15, 2021, DLA issued Amendment 0007, which formalized DLA's corrective action:

> As part of the corrective action, the Agency will re-evaluate price proposals, make a new price realism analysis, and make a new source selection decision.  The Agency does not expect to re-open negotiations or conduct discussions, but the Agency reserves the right to do so. Offerors are now being afforded the opportunity to submit a total compensation plan in accordance with FAR 52.222-46.  The total compensation plan is separate and distinct from the previously submitted informal cost breakdowns and statements made in the price and non-price proposals.

AR 3480; *see also* AR 3484 (indicating that DLA issued the Amendment on July 15, 2021).

Amendment 0007 also required offerors to ensure that their TCPs were "accompanied with a cover letter and narrative explaining the plan," limited the TCP submissions to "no more than eight (8) pages in length," and provided that "*[n]o other changes to proposals are permitted.*"  AR 3480 (emphasis added).

Following Amendment 0007, the Court dismissed *EGS I*, without prejudice, as moot.  Order of Dismissal, *EGS I*, No. 21-1388C (Fed. Cl. July 15, 2021), ECF No. 34.  On July 26, 2021, EGS and KBR both submitted TCPs in response to Amendments 0007 and 0008.[14]  AR 4060.  No party challenged the propriety of either Amendment 0007 or Amendment 0008.

### E.  DLA's Requested "Clarification" of KBR's Total Compensation Plan

After EGS and KBR submitted their respective TCPs, the PET re-evaluated their price proposals and conducted "a new price realism analysis" on July 27, 2021.  AR 4060, 4078 (PET Report of August 2, 2021 ("Second PET Report")).  The Second PET Report observed that although the salaries in EGS's TCP were "higher than the national average," EGS "provided sufficient documentation to demonstrate that its total compensation plan is realistic for the work to be performed."  AR 4072.  The PET concluded that "[n]o clarifications or discussions are required" from EGS.  AR 4072.  The PET also found KBR's proposed compensation to be "realistic for the work to be performed" and that it "aligns with [the] supplemental data that was provided."  AR 4078.  The PET concluded that KBR's TCP's "position descriptions and supporting documentation *raise no concerns about KBR's ability to perform the requirements of the PWS*."  AR 4078 (emphasis added).

Nevertheless, the PET determined that "[o]ne *clarification* is required" from KBR.  AR 4078 (emphasis added).  Accordingly, on July 29, 2021, the government emailed KBR a request for additional information regarding its TCP:

> Based on the supplemental data that was provided by KBR, the hourly rates for the *project labor title* match but the *annual pay* does not match.  For example, the [Maintenance Personnel Manager ("MPM")] shows in Exhibit 1 an annual pay of $[ * * * ] but on page 9 of the narrative, the salary shown for the MPM is $[ * * * ].  This should be a *simple clarification* with KBR to understand the Exhibit 1 annual pay column.

AR 3565 (emphasis added).  The Agency's request references "supplemental data" — nine pages appended to KBR's TCP that show how KBR calculated its compensation for each position.  AR 3553–61.  In particular, the supplemental data consists of annotated screenshots describing compensation for each position addressed in the TCP, based on either current, internal corporate data or compensation surveys.  AR 3553–61; *see also*

---

[14] On July 16, 2021, DLA issued Amendment 0008 to answer questions the offerors submitted in response to Amendment 0007.  AR 3488–89.

ECF No. 34 ("Tr.") 49:7–11 (discussing "a PeopleSoft [human resources] type of system").

The government's clarification request pointed out that the annual pay in some screenshots did not match the annual pay in the body of the TCP; this discrepancy is evident in a comparison of the TCP itself with an excerpt from its supplemental data:

| Exhibit 1. Detailed Salary and Fringe Benefits Compensation for Professional (non-SCA) Employees | | | | | |
|---|---|---|---|---|---|
| Project Labor Title | Base Hourly Rate | Applied Hourly Rate (Escalated) | Annual Pay | Annual Fringe Benefits | Total Annual Compensation |
| Year 1 | | | | | |
| Maintenance Program Manager (MPM) | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] |

AR 3548 (TCP Exhibit 1) (emphasis added).  While the TCP thus indicated Annual Pay as $[ * * * ] and Total Annual Compensation (including fringe benefits) as $[ * * * ], the TCP's supplemental data contained a different salary sum:

| Proposal Job Title | Employee Number | Hourly Rate |
|---|---|---|
| Maintenance Program Manager (MPM) | [ * * * ] | $[ * * * ] / 2080 Hours = $[ * * * ]/hr |

AR 3554 (emphasis added).

In response to the government's clarification request, KBR emailed the government a timely explanation of how it calculated total compensation and included a clarified TCP.  AR 3564–65; AR 3570–84 ("Corrected TCP").  KBR explained the minor edits as follows:

> The annual pay shown in screen shots is a combination of compensation paid to an employee to include productive hours (1848 hrs), and non-productive hours (240 hrs). The table previously provided, calculated the non-productive hours (which is a combination of holiday pay and paid time off) as part of the fringe rate. The base hourly rate shown in the table is the employee's annual compensation (shown in screen shots) divided by total number of productive hours plus non-productive hours (2080 hrs). In calculating salaries, 2080 hours per year (52 weeks), is used to determine the hourly rate from the annual pay.

> . . .
>
> We use the applied hourly rate (which includes an annual escalation) and not the base hourly rate to derive total annual compensation. . . . The applied hourly rate is used to calculate productive and non-productive hours, to derive the total annual pay (which is greater than the annual compensation shown in the screen shot due to escalation). *Then we combine the total annual pay with the annual fringe to derive the total annual compensation for each employee.*

AR 3564 (emphasis added).

KBR's explanation can be illustrated with a simple example.  In KBR's initial TCP, the "Detailed Salary and Fringe Benefits Compensation for Professional (non-SCA) Employees" table included six columns breaking down total annual pay for each position by year.  For example, KBR represented pay for the "Engineer/Scientist 2" position in "Year 2" as follows:

| Project Labor Title | Base Hourly Rate | Applied Hourly Rate (Escalated) | **Annual Pay** | **Annual Fringe Benefits** | Total Annual Compensation |
|---|---|---|---|---|---|
| Engineer/Scientist 2 | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] |

AR 3549 (KBR's initial TCP) (emphasis added).  In this table, "Total Annual Compensation" is the sum of "Annual Pay" and "Annual Fringe Benefits."  *See* AR 3564 (explaining that KBR "combine[d] the total annual pay with the annual fringe to derive the total annual compensation").[15]

---

[15] Fringe benefits are non-salary benefits like 401(k) plans, health insurance, and paid time off, among other things.  AR 4075 (Second PET Report) (explaining KBR's benefits included in KBR's fringe rate).  At oral argument, KBR's counsel described how the fringe benefit calculations represented in the TCP were internal to KBR:

> THE COURT: So whether you call it fringe or you call it nonproductive salary, who cares?
>
> [KBR COUNSEL]: I will make one more point about that . . . . It does not matter to the employee itself. None of this matters to the employee itself —
>
> THE COURT: In terms of recruitment and retention?
>
> [KBR COUNSEL]: In terms of retention. They are getting the same benefits. They are getting the same annual pay. And by the way,

KBR's Corrected TCP submission included additional columns in the chart:

| Project Labor Title | Base Hourly Rate | Applied Hourly Rate (Escalated) | **Annual Pay (Productive Hours)** | **Annual Pay (Non-Productive Hours)** | **Annual Pay (Productive + Non-Productive Hours)** | **Annual Fringe Benefits (Excluding Non-Productive Hours)** | Total Annual Compensation |
|---|---|---|---|---|---|---|---|
| Engineer / Scientist 2 | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] |

AR 3571 (emphasis added).

In KBR's Corrected TCP, the "Total Annual Compensation" column remains the same as in the initial TCP — with one exception discussed below — as do the "Base Hourly Rate" and "Applied Hourly Rate (Escalated)" columns. *Compare* AR 3549, *with* AR 3571. The difference lies in the four emphasized columns. The "Annual Pay" column in the initial TCP is labeled "Annual Pay (Productive Hours)" in the Corrected TCP. *Compare* AR 3549, *with* AR 3571. The "Annual Fringe Benefits" column in the initial TCP is then split into two columns in the Corrected TCP: "Annual Pay (Non-Productive Hours)" and "Annual Fringe Benefits (Excluding Non-Productive Hours)." *Compare* AR 3549, *with* AR 3571. Finally, the new column in the Corrected TCP — "Annual Pay (Productive + Non-Productive Hours)" — is, as its title suggests, the sum of the "Annual Pay (Productive Hours)" and "Annual Pay (Non-Productive Hours)" columns. *See* AR 3571.

Finally, KBR's Corrected TCP corrects an apparent math error present only in Year 1. AR 3548–49, AR 3564, AR 3570–71. Correcting that error increased "Total Annual Compensation" for Year 1 by a negligible $2,503.63.[16] The "Total Annual Compensation" column was unchanged in all other years.

---

KBR is paying internally the same fringe costs. It's just they presented it in a different format in the updated table.

Tr. 55:7–18; *see also* Tr. 91:14–15 (KBR counsel explaining that the fringe benefit calculations are "internal to KBR" and have "nothing to do with the agency's evaluation").

[16] In the email accompanying KBR's Corrected TCP, KBR explained its math correction: "In reviewing the salaries to provide clarification to the Government, we noticed that the compensation *for Year 1 only*, did not correlate with the final pricing files previously submitted to the Government. As such, we have made corrections to Year 1, correlating to our submitted final pricing[.]" AR 3564–65 (emphasis added). Correcting this mathematical error did not change KBR's contract price. *Compare* AR 2615 (First SSAD, reflecting KBR's final price as

In sum, KBR's Corrected TCP adds new details but did not substantively alter KBR's price proposal in any way.  Rather, the Corrected TCP:  (1) renames the former "Annual Pay" column as "Annual Pay (Productive Hours)"; (2) splits the initial TCP's "Annual Fringe Benefits" column into two columns (*i.e.*, "Annual Pay (Non-Productive Hours)" and "Annual Fringe Benefits (Excluding Non-Productive Hours)"); and (3) creates a new column, "Annual Pay (Productive + Non-Productive Hours)," representing the sum of the former "Annual Pay" column and the new "Annual Pay (Non-Productive Hours)" column.  AR 3570–72.  Again, however, the Court notes that KBR *did not change the "Total Annual Compensation" column* outside of a $2,503.63 modification in Year 1 due to a math error.  *Compare* AR 3548–49, *with* AR 3570–71.

### F.  The SSA's Second Evaluation and Second Award to KBR

DLA issued a new SSAD on August 5, 2021.  AR 3609–15 ("Second SSAD").  The Second SSAD compared the offerors under each factor, reaffirmed the prior technical ratings,[17] and included an analysis of the TCPs.  AR 3609–15.  The SSA once again recommended award to KBR, finding that "the proposals are essentially equal," that "the evaluated price has become more important," and that it was not "in the Government's best interest to pay approximately $8 million more for the slight difference between the proposals."  AR 3614.

The Second SSAD summarized the offerors' ratings with the same chart used in the prior SSAD.  AR 3614; *see also supra* Section I.B.

The Second SSAD contrasted the offerors' proposed prices in more detail than did the First SSAD, observing that "[t]he offerors' respective pricing is consistent with the various elements of their technical proposals.  EGS proposed to include technicians [ * * * ] while KBR proposed to have the technicians [ * * * ] allowing for less [sic] technicians, which drives to a lower overall price."  AR 3611.  The SSA acknowledged that "KBR's price is significantly lower than the IGCE," but explained that "the IGCE was based on the Cost contract using the incumbent's structure, which . . . is different

---

$38,109,181.90), *with* AR 3614 (Second SSAD, reflecting the same price).  Instead, as KBR explained, the changes conformed the TCP to KBR's FPR pricing, which was not revised in any way.  In any event, the total value of the corrected salaries increased by only $2,503.63, which is approximately .005% of the contract's total maximum value.  *Compare* AR 3548–49, *with* AR 3570–71 (indicating minor salary increases for Year 1).

[17] The Second SSAD incorporated virtually all of the First SSAD's analysis of the non-price factors.  *Compare* AR 2611–16 (First SSAD), *with* AR 3609–15 (Second SSAD); *see also* AR 3480 (Amendment 0007, providing that "[n]o other changes to proposals are permitted" outside of the TCPs).

than the KBR's proposed strategy."  AR 3613.  The Second SSAD found that "[a]lthough the incumbent managed the AFHE maintenance differently, there were no identified technical concerns with KBR's proposal and [because] this is a firm fixed price contract, the risk will rest on KBR." *Id.*

Finally, the SSA concluded that both offerors' TCPs were "realistic for the work to be performed."  AR 3614.  The SSA also noted that the "positions and the salaries with fringe benefits indicate the capability of the proposed compensation structure to obtain and keep suitable qualified personnel to meet mission objectives" and that "the differences in skills, the complexity of various disciplines, and professional job difficulty have been evaluated and considered."  AR 3614.

On September 1, 2021, DLA notified EGS of the Agency's new decision to award the contract to KBR.  AR 3629–31.  DLA held an oral debriefing with EGS on September 2, 2021, and conducted further debriefing via email.  AR 3645–51.

### G.  EGS's Second GAO Protest

On September 10, 2021, EGS filed a second protest with the GAO, this time challenging DLA's post-corrective action contract award decision.  AR 3664.  EGS argued that DLA:  (1) failed to perform a price realism analysis regarding KBR's professional employees; (2) performed an unreasonable price realism analysis of KBR's non-professional employees; (3) engaged in unequal discussions during corrective action, failed to engage in meaningful discussions regarding EGS's "misunderstanding" of CLIN 0001, and engaged in misleading discussions regarding EGS's price; (4) improperly evaluated past performance; (5) failed to properly evaluate KBR's "unrealistically low" price; (6) failed to properly evaluate technical approach; and (7) improperly converted the procurement into an LPTA source selection or, alternatively, conducted an improper best value tradeoff analysis.  AR 3664–3708.

The GAO denied the protest on December 15, 2021.  AR 4045; *ENGlobal Gov't Servs., Inc.*, B-419612.3, 2022 CPD ¶ 12, 2021 WL 6423779 (Comp. Gen. Dec. 15, 2021).  The GAO found untimely all of EGS's arguments that "pertain[ed] to the agency's prior evaluation and award decision" because those "were clearly unaffected by the agency's corrective action."  AR 4048.  Accordingly, the GAO considered those arguments "either a request for reconsideration of [GAO's] prior decision," or "a challenge to the scope of the agency's corrective action," both of which were untimely.  AR 4048.

Although GAO denied EGS's protest, the GAO also concluded that the email exchange between DLA and KBR following corrective action constituted discussions, as EGS claimed, and not a clarification, as DLA and KBR had argued.  AR 4049–52.  Citing

GAO precedent,[18] the decision concluded that the exchange "ultimately constituted discussions" because "KBR submitted a revised proposal that was evaluated by the agency in reaching its decision to select KBR for award." AR 4052. Specifically, the GAO characterized KBR's response to DLA's question as "a revised exhibit with additional columns, pricing information, and revised pricing totals, and a narrative in an email detailing how its prices were calculated." AR 4052 (finding that the "revised exhibit and the accompanying narrative were reviewed and incorporated by the agency in its evaluation documents"). As a result, the GAO concluded that DLA should have also opened discussions with EGS. AR 4052.

Despite labeling KBR's submission of its Corrected TCP a discussion, the GAO denied EGS's protest because DLA's failure to conduct discussions with EGS "did not prejudice" it. AR 4052. According to the GAO, "[i]n the context of unequal discussions, the focus of our inquiry is on whether the protester, had it been afforded meaningful discussions, could have revised its proposal in a manner that would result in a substantial chance of the protester receiving the award." AR 4052. Because "the agency did not identify any concerns with EGS's professional compensation plan that [DLA] would have been required to raise had [DLA] opened discussions with EGS," the GAO concluded that EGS was not prejudiced by DLA's further discussions with KBR. AR 4052.

In so holding, the GAO rejected EGS's argument that "had [EGS] been afforded the opportunity for a post-corrective action round of discussions, it would have revised its proposal in other ways." AR 4052–53. Agencies, the GAO observed, "may . . . reasonably limit the scope of revisions" allowed in discussions. AR 4053. In this case, DLA "permitted the offerors to submit . . . professional compensation plans for the purposes of evaluating in accordance with FAR provision 52.222-46 and specified that '*[n]o other changes to proposals are permitted*.'" AR 4053 (emphasis added) (quoting AR 3480 (Amendment 0007)). Accordingly, "even if [DLA] had also opened discussions with EGS," EGS "has not established that the agency would have been required to allow EGS to revise other areas of its proposal, such as its proposed transition-in costs." AR 4053.

---

[18] *See* AR 4051 ("the test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for proposals to be materially changed" (citing *Priority One Servs., Inc.*, B-288836, 2002 CPD ¶ 79, 2001 WL 1872433 (Comp. Gen. Dec. 17, 2001))); *see also id.* ("[t]he agency's characterization of a communication as clarifications or discussions is not controlling; it is the actions of the parties that determine whether discussions have been held" (citing *Priority One Servs.*, 2001 WL 1872433)).

The GAO also rejected EGS's argument that DLA improperly evaluated EGS's professional employee compensation plan under FAR 52.222-46.  AR 4053–55.  The GAO concluded that DLA's evaluation met the "two required analyses that the agency must perform" pursuant to FAR 52.222-46 and GAO precedent — "one based on the price realism of the compensation plan and the other considering whether the compensation plan will allow for program continuity."  AR 4054–55.

Following this second GAO decision, EGS once again filed suit in this Court.

## II.    PROCEDURAL HISTORY

On December 21, 2021, EGS filed its latest complaint, initiating this case.  ECF No. 1.  EGS alleges that:  (1) DLA failed to conduct fair and equal discussions during corrective action and improperly allowed KBR to change its pricing, Compl. ¶¶ 87–102 (Count One); (2) DLA disparately treated EGS and KBR in evaluating transition-in costs and failed to hold meaningful discussions regarding price, *id.* ¶¶ 103–31 (Count Two); (3) DLA failed to properly evaluate the proposed *professional* employee compensation in KBR's TCP pursuant to FAR 52.222-46, *id.* ¶¶ 132–37 (Count Three); (4) DLA failed to properly evaluate the price realism of KBR's proposed *non-professional* employees covered by the Service Contract Act ("SCA"),[19] *id.* ¶¶ 138–158 (Count Four); and (5) DLA conducted an improper tradeoff analysis and best value determination, *id.* ¶¶ 159–65 (Count Five).

KBR filed a motion to intervene on December 21, 2021, which the Court granted the same day.  ECF No. 9; Minute Order (Dec. 21, 2021).  On December 22, 2021, the Court held a telephonic preliminary status conference, to discuss, among other things, the briefing schedule and the fact that EGS represented in its complaint that it was not

---

[19] The McNamara-O'Hara Service Contract Act of 1965 § 2(a), 41 U.S.C. §§ 6702–6703, provides that every contract, subject to a few exceptions, entered into by the federal government or District of Columbia for more than $2,500 and "has as its principal purpose the furnishing of services in the United States through the use of service employees" must include various wage-protection provisions, including one "specifying the minimum wage to be paid to each class of service employee engaged in the performance of the contract," and one "specifying the fringe benefits to be provided to each class of service employee engaged in the performance of the contract."  The FAR defines "service employee" as "any person engaged in the performance of this contract other than any person employed in a bona fide executive, administrative, or professional capacity."  FAR 52.222-41.  This Court has observed that "the primary purpose of the SCA is to protect 'wage standards of employees' by preventing 'federal purchasing power [from] playing a role in suppressing wage rates,' with particular emphasis given to the impact of that power in rebiddings and successor contracts."  *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 370 (2010) (alteration in original) (quoting *Ft. Hood Barbers Ass'n v. Herman*, 137 F.3d 302, 309 (5th Cir. 1998)).

seeking a temporary restraining order ("TRO") or preliminary injunction ("PI").  ECF No. 13; ECF No. 20.  EGS asserted that it was not seeking a TRO or PI because the government tentatively had agreed to a voluntary stay through April 22, 2022.  Compl. at 2 n.1.  During the status conference, the government confirmed this voluntary stay.  *See* ECF No. 20 at 1.  Accordingly, the Court explained in its subsequent order that "[t]he Court views such a voluntary stay as having the effect of a preliminary injunction in terms of preserving the status quo should EGS succeed on the merits of its complaint and otherwise demonstrate that a permanent injunction is warranted" and that "[i]f the government views the nature of its voluntary stay differently, the government shall promptly notify the parties and the Court."  *Id.* at 1–2.

The government filed the administrative record on January 14, 2022.  ECF No. 22.[20]  On February 4, 2022, the government filed an unopposed motion for leave to correct the administrative record, ECF No. 23, which the Court granted, Minute Order (Feb. 6, 2022).  The parties filed timely cross-motions for judgment on the administrative record on February 11, 2022.  ECF Nos. 25 ("Pl. MJAR"); 26 ("KBR MJAR"); 27 ("Def. MJAR").  The parties filed timely response briefs on March 11, 2022.  ECF Nos. 29 ("Def. Resp."), 30 ("Pl. Resp."), 31 ("KBR Resp.").

The Court held oral argument on the parties' various motions on March 29, 2021.  ECF No. 32.

## III.    JURISDICTION AND STANDING

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1); *see also Tolliver Grp., Inc. v. United States*,

---

[20] On February 11, 2022, EGS moved to include a declaration of an EGS vice president "in the Court Record."  ECF No. 24 at 1.  EGS contends that the Court "regularly includes in the Court Record declarations from protestors addressing irreparable harm, the balance of harm, and the public interest injunctive relief factors" and that "[t]he Declaration is limited to evidence supporting these three factors."  *Id.*  The government argued that EGS's motion was unnecessary.  ECF No. 28 at 1.  While the government is correct that EGS did not need to file a motion to allow the Court to consider its Declaration, *see, e.g., L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 288–89 n.4 (2011), the Court nevertheless **GRANTS** EGS's motion.

151 Fed. Cl. 70, 84 & n.11 (2020); *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[21]

Thus, to establish standing in a bid protest action, a plaintiff must demonstrate that it is an "interested party." *Aero Spray*, 156 Fed. Cl. at 559 (explaining that "the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870[,] . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them"). An "interested party" is "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).

No party challenges either the Court's jurisdiction or EGS's standing in this case. Nevertheless, the Court has an independent duty to ascertain whether it possesses jurisdiction to decide EGS's claims and whether EGS has standing to pursue them. RCFC 12(h)(3); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))).

The Court has considered the allegations in EGS's complaint and concludes that EGS qualifies as an interested party with respect to the procurement at issue.   EGS has sufficiently alleged facts that, if proven, demonstrate the requisite prejudice for the purposes of interested party status and jurisdiction.  *See Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019) ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions. . . . But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence."); *see also James v. J2 Cloud Servs., LLC*, 887 F.3d 1368, 1372 (Fed. Cir. 2018) (courts reviewing a dismissal "for want of standing . . . must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party" (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))); *Blue Origin Fed'n,*

---

[21] *Cf. Tolliver*, 151 Fed. Cl. at 96–97 ("[A]lthough '[the Administrative Dispute Resolution Act] covers primarily pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

*LLC v. United States*, 157 Fed. Cl. 74, 89 (2021) ("For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true."); *Yang Enters., Inc. v. United States*, 156 Fed. Cl. 435, 444 (2021) ("The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry.").[22]

## IV.    STANDARD OF REVIEW

Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354. Accordingly, this Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence contained in the administrative record. *Id.* at 1356–57.

Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019). That APA standard, in turn, requires the Court to determine "whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)). In other words, the Court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)). "When a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (internal citation marks omitted). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

---

[22] The fact that a plaintiff may "successfully allege[] an injury (or prejudice) for standing purposes" — because if the plaintiff "succeeded on the merits . . . it would have a 'greater than an insubstantial chance of securing the contract'" — does not excuse a plaintiff from proving prejudice on the merits based on the administrative record. *Am. Relocation Connections*, 789 F. App'x at 227 (quoting *Info. Tech. & Applications Corp. v. United States* (*ITAC*), 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

"In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions." *IAP Worldwide Servs., Inc. v. United States*, -- Fed. Cl. --, 2022 WL 1021781, at *13 (2022) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).  In particular, protests involving "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  Thus, in reviewing an agency's procurement decision, the Court shall merely "determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa*, 238 F.3d at 1332–33 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Accordingly, the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colorado Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)).  "On the other hand, the Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; *post hoc* explanations for agency decisions ordinarily will be rejected." *IAP Worldwide Servs.*, 2022 WL 1021781, at *13; *see also Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) ("The court must be wary of 'post-hoc rationale,' or 'any rationale that departs from the rationale provided at the time the procuring agency made its decision.'" (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015), *aff'd*, 809 F.3d 590 (Fed. Cir. 2015))), *aff'd*, 22 F.4th 994 (Fed. Cir. 2021).

To establish prejudice on the merits in a post-award challenge, a plaintiff must show that, but for the agency's error, "the protestor's chance of securing the award [would] not have been insubstantial" but for the alleged error.  *ITAC*, 316 F.3d at 1319; *see also Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 98 (2021) (discussing standard of review and showing of prejudice in bid protest cases).

## V.    DISCUSSION

### A.  The Government's Exchange with KBR During Corrective Action Was a Mere Clarification and Not Another Round of Discussions Entitling EGS to Another FPR (Count One)

In Count One of EGS's complaint, EGS alleges that the emails exchanged between the government and KBR during corrective action constituted discussions that improperly and materially prejudiced EGS.  Compl. ¶¶ 87–102.  Specifically, EGS asserts:  (1) KBR's Corrected TCP included different prices and more detailed pricing tables than did its initial TCP, *id.* ¶¶ 89, 95; (2) KBR's proposal was unacceptable and unawardable before KBR provided its Corrected TCP, *id.* ¶¶ 90, 93–94; (3) the

government's failure to permit EGS to change its price constituted disparate treatment, *id.* ¶¶ 91–92, 96, 99; and (4) given the opportunity, EGS could have lowered its price, which would have provided EGS a substantial chance at award, *id.* ¶ 100.

This Court concludes that the exchange between the government and KBR during corrective action constituted clarifications, not discussions. Moreover, even if the exchange could be construed as discussions, EGS has not demonstrated prejudice.

### 1. The FAR Distinguishes Between Discussions and Clarifications

The FAR defines a "discussion" as an exchange between the government and an offeror intended to allow that offeror to revise its proposal, typically in a FPR. In that regard, the FAR provides:

> Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. . . . When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

FAR 15.306(d); *see also* FAR 15.307(b) ("At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision.").

During discussions, a contracting officer ("CO") "must . . . indicate to, or discuss with, each offeror . . . deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). Once discussions are initiated, they "must be conducted . . . with each offeror within the competitive range." FAR 15.306(d)(1). The United States Court of Appeals for the Federal Circuit, our appellate court, has explained that "[t]he purpose of the rule that the government may not hold discussions with only one bidder is 'to prevent a bidder from gaining an unfair advantage over its competitors by making its bid more favorable to the government in a context where the other bidders have no opportunity to do so.'" *ITAC*, 316 F.3d at 1320 (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1561 (Fed. Cir. 1996)).

The CO retains some discretion, however, and "is not required to discuss every area where the proposal could be improved"; instead, both "[t]he scope and extent of discussions are a matter of [CO] judgment." FAR 15.306(d)(3). This Court has phrased the rule even more bluntly: "meaningful discussions" do not require "an agency . . . to

'spoon-feed' offerors[.]" *Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 343 (2009). Finally, the FAR provides that "[a]t the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision." FAR 15.307(b).

In contrast to discussions, clarifications are "*limited exchanges*, between the Government and offerors, that may occur when award without discussions is contemplated." FAR 15.306(a)(1) (emphasis added). Examples of clarifications include asking an offeror to explain "the relevance of an offeror's past performance information," to address "adverse past performance information to which the offeror has not previously had an opportunity to respond," or to correct "minor or clerical errors." FAR 15.306(a)(2); *see also WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 270 (2021) (holding that a series of exchanges constituted clarifications because they all "merely amounted to correcting mistakes that were either clearly clerical or relatively minor errors or where the information was readily present elsewhere in the proposal"). Also, unlike discussions, the government is permitted to engage in clarifications with fewer than all offerors (*i.e.*, even with only one offeror). *See, e.g., Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 535 (2013) (citing *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 540 (2007)).

The Federal Circuit has held that clarifications can provide information not previously included in an offeror's proposal, including information necessary to evaluate the proposal. *ITAC*, 316 F.3d at 1323 (explaining that "[a]ny meaningful clarification would *require* the provision of information," that "the example of a clarification given in the regulation, 'the relevance of an offeror's past performance information,' requires the provision of information," and that "[t]here is no requirement in the regulation that a clarification not be essential for evaluation of the proposal" (emphasis added) (quoting FAR 15.306(a)(2))). Finally, the Federal Circuit has warned against applying a "cramped conception of 'clarification'" in light of the FAR's 1997 amendments. *ITAC*, 316 F.3d at 1323 (explaining that one of the purposes of the 1997 amendments was to "[s]upport[ ] more open exchanges between the Government and industry, allowing industry to better understand the requirement [sic] and the Government to better understand industry proposals" (alteration in original) (quoting Federal Acquisition Regulation; Part 15 Rewrite; Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. 51224, 51225 (Sept. 30, 1997))).

Critically, for our purposes, the Federal Circuit has held that the FAR Council's 1997 FAR revisions "significantly broadened" the scope of exchanges between the government and an offeror that may be covered by the term "clarifications." *ITAC*, 316 F.3d at 1322. The Federal Circuit explained its reasoning in some detail:

> We first note that the regulations were altered significantly in 1997. *Compare* 48 C.F.R. §§ 15.601, 15.607, 15.610 (1991), *with* 48 C.F.R. § 15.306 (2002). The preexisting regulations strictly limited the definition and purpose of clarifications. Section 15.601 specified that clarifications were "for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal." 48 C.F.R. § 15.601 (1991). All communications for larger purposes, specifically communications "(a) involv[ing] information essential for determining the acceptability of a proposal, or (b) provid[ing] the offeror an opportunity to revise or modify its proposal," constituted discussions. *Id.*
>
> Under the new regulation, 48 C.F.R. § 15.306, "clarifications" are defined as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated." 48 C.F.R. § 15.306(a) (2002). The regulation further provides examples of clarifications[.]

*ITAC*, 316 F.3d at 1321. Thus, exchanges that an agency previously may have classified as discussions may now be treated as mere clarifications.

To determine whether a particular exchange qualifies as a clarification or constitutes discussions, this Court repeatedly has held that the "acid test" is "[w]hether an agency afforded an offeror the opportunity to revise or modify its proposal." *See, e.g.*, *Orca Nw. Real Est. Servs. v. United States*, 65 Fed. Cl. 1, 11 (2005). Where a proposal has been substantively revised or modified, discussions have occurred. *Conley & Assocs., Inc. v. United States*, 142 Fed. Cl. 177, 184 (2019) ("The 'acid test' for whether an agency has engaged in discussions is whether it provided an opportunity for proposals to be revised or modified."); *RMGS, Inc. v. United States*, 140 Fed. Cl. 728, 742 (2018) ("Thus, 'the acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal.'" (quoting *DynCorp Int'l*, 76 Fed. Cl. at 541)); *Rivada Mercury, LLC v. United States*, 131 Fed. Cl. 663, 679 (2017) ("In applying the definitions set forth in the FAR, 'the acid test for deciding whether discussions have been held is whether it can be said that an offeror was provided the opportunity to revise or modify its proposal.'" (quoting *Davis Boat Works, Inc. v. United States*, 111 Fed. Cl. 342, 353 (2013))). The Federal Circuit similarly has emphasized that discussions involve the opportunity for substantive proposal revisions. *See Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1332 (Fed. Cir. 2004) ("[I]n the context of a government contract proposal, the term 'discussions' has a specific legal definition: 'discussions involve negotiations' and 'are undertaken with

the intent of allowing the offeror to revise its proposal.'" (quoting *ITAC*, 316 F.3d at 1321)).

The parties' actions during an exchange — and not the agency's label of the exchange — ultimately determine whether it was a clarification or discussions. *Mil-Mar*, 111 Fed. Cl. at 535. Nevertheless, in close cases the Court must give deference to an agency's reasonable interpretation of that exchange. *See, e.g.*, *ITAC*, 316 F.3d at 1323 ("[W]e give deference to an agency's permissible interpretation of its own regulations."); *Mil-Mar*, 111 Fed. Cl. at 535 ("[T]he agency's characterization of an exchange as a clarification is entitled to deference from the court[.]"); *DynCorp Int'l*, 76 Fed. Cl. at 542 ("[F]ollowing *ITAC* as it must, this court resolves very close questions about an EN in favor of the government, if the EN was intended as a clarification, was labeled as such, did not *clearly* violate the limitations on clarifications expressed in FAR 15.306(a), and did not *clearly* stray into the forbidden zone of discussions described in FAR 15.306(d)." (emphasis added)).

>   **2.  The Government's Exchange with KBR During Corrective Action Was a Clarification Because Amendment 0007 Did Not Permit KBR to Revise Its Proposal**

The Court holds that the email exchange between the government and KBR during corrective action was a clarification, not discussions. Following the offerors' TCP submissions, DLA's further exchange with KBR merely corrected a discrepancy within KBR's TCP but did not otherwise allow KBR to revise its proposal. *See* FAR 15.306(d) (labeling discussions as "negotiations . . . that are undertaken with the intent of allowing the offeror to revise its proposal").

Indeed, while Amendment 0007 "afforded [the offerors] the opportunity to submit a total compensation plan in accordance with FAR 52.222-46[,]" that Amendment expressly precluded any other proposal updates. AR 3480. In that regard, FAR 52.222-46 covers "Evaluation of Compensation for Professional Employees" and requires offerors, "[a]s part of their proposals," to "submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract." FAR 52.222-46(a). The FAR further requires the government to "evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements." *Id.* In particular, the evaluation must "include an assessment of the offeror's ability to provide uninterrupted high-quality work" — *i.e.*, the government must consider the proposed professional compensation "in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation." *Id.* The FAR "caution[s]" offerors

"that lowered compensation for essentially the same professional work may indicate lack of sound management judgment and lack of understanding of the requirement," FAR 52.222-46(b), and that "unrealistically low" professional compensation "may be viewed as evidence of failure to comprehend the complexity of the contract requirements," FAR 52.222-46(c); *see also* FAR 52.222-46(d) ("Failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal.").

Here, both KBR and EGS included labor costs in their original proposals.  AR 1542 (EGS's informal cost breakdown, listing labor costs); AR 1840 (KBR's informal cost breakdown, listing labor costs).  Within that context, the TCP in this procurement was simply an opportunity for the offerors to show their work, so to speak, in calculating these labor costs — not to change their final calculations.  *See Sparksoft Corp. v. United States*, 141 Fed. Cl. 609, 624 (2019) ("A key purpose of FAR § 52.222-46 is 'to evaluate whether offerors will obtain and keep the quality of professional services needed for adequate contract performance, and to evaluate whether offerors understand the nature of the work to be performed.'" (quoting *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 369-70 (2010))).

KBR's initial TCP submission complied with FAR 52.222-46.  KBR's TCP included a six-column table breaking down total annual compensation for its ten professional positions for each of the contract's five contract years.  AR 3548–49.  That table shows that KBR determined "total annual compensation" for each position as the sum of "annual pay" (the employee's salary) and "annual fringe benefits" (*e.g.*, health insurance, some cost of which is paid for by employers but is not included in an employee's salary).  AR 3548–49; *see also* AR 4075 (Second PET Report) (describing KBR's fringe benefits as non-salary benefits like 401(k) plans and health insurance).[23] KBR further supported its TCP with several pages of data, as detailed above.  *See* AR 3553–61.

In any event, what is clear is that FAR 52.222-46 operates independently of the Solicitation's Section M evaluation factors (and its best value framework) to impose a "compensation realism analysis" — a sort of targeted form of price realism analysis which "evaluates whether a proposed compensation is too low."  *Eskridge & Assocs. v. United States*, 955 F.3d 1339, 1346 (Fed. Cir. 2020); *see also Sparksoft Corp.*, 141 Fed. Cl. at 627 (concluding that an agency "ha[d] an obligation to undertake a realism analysis of the professional compensation rates . . . to ensure they will satisfy the requirements of FAR § 52.222-46 and provide the government 'uninterrupted high-quality work'"

---

[23] *See also* Tr. 52:6–12 (KBR counsel explaining "[w]hen a person receives their salary, that's the money they are taking home.  And then on top of that they get all sorts of fringe benefits, health care, days off, vacation, sick time, 401(k), and . . . [even] pet insurance . . . .").

(quoting FAR 52.222-46)); *Abacus Tech. Corp.*, B-417749, 2020 CPD ¶ 125, 2020 WL 1547463, at *4 n.2 (Comp. Gen. Mar. 9, 2020) (recognizing that FAR 52.222-46 provides for, "in effect, a price realism evaluation regarding an offeror's proposed compensation"); *Sys. Plus, Inc.*, B-413323, 2017 WL 2570951, at *5 (Comp. Gen. May 11, 2017) (GAO "has noted that this FAR provision anticipates an evaluation of whether an awardee understands the contract requirements, and has proposed a compensation plan appropriate for those requirements — in effect, a price realism evaluation regarding an offeror's proposed compensation.").

Accordingly, there was no reason for DLA to require or to permit an entirely new FPR as part of corrective action where, as here, all that was left for the Agency to do was to receive the information FAR 52.222-46 required offerors to submit and for the Agency to analyze it. If EGS had any objections to this limited scope of corrective action, EGS should have challenged the terms of Amendment 0007 when DLA issued it (perhaps before the submission of the TCPs and definitely no later than award); in any event, the time for such challenges has long passed. *See COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1381–82 (Fed. Cir. 2012). In *COMINT*, the Federal Circuit applied the *Blue & Gold* waiver rule[24] to hold that a disappointed offeror waived its objection to a post-proposal submission solicitation amendment because the offeror did not object to the amendment until after contract award. *Id.* at 1381–82. The agency in that case issued an amendment that restricted the contract's scope "[d]uring the course of the review of the submitted bids." *Id.* at 1380. The disappointed offeror, COMINT, "signed and returned its copy of the amendment to the agency" but did not file its action challenging the amendment until after contract award. *Id.* at 1380–82. The Federal Circuit held that COMINT waived its objection because "the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *Id.* at 1381–82. The Federal Circuit explained that COMINT's signing the amendment "signal[ed]" COMINT's "agreement with" the amendment's terms — and that COMINT "had two and a half months" before award in which to challenge the amendment, which provided "more than an adequate opportunity to object." *Id.* at 1382–83.

The same reasoning in *COMINT* applies to bar any objection EGS now has to the scope of Amendment 0007. Like COMINT, EGS "signed and returned its copy of the amendment to the agency." 700 F.3d at 1382; AR 3543 (EGS signed Amendment 0007, dated July 26, 2021). EGS also had almost two months to object to the terms of

---

[24] *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims").

Amendment 0007.  AR 3484 (showing that DLA issued Amendment 0007 on July 15, 2021); AR 3631 (showing that DLA notified EGS of the award to KBR on September 1, 2021).  EGS thus had "more than an adequate opportunity to object" to Amendment 0007.  *COMINT*, 700 F.3d at 1383.[25]

Thus, notwithstanding DLA's clear intent that corrective action would be limited to the Agency's receipt and analysis of TCPs (*i.e.*, to meet the requirements of FAR 52.222-46), EGS effectively attempts to rewind the clock so that it can challenge the Agency's entire approach.  In particular, EGS wants the opportunity to submit an entirely new FPR, complete with new pricing.  Because EGS could not submit a FPR pursuant to the express terms of Amendment 0007, EGS instead attempts to avoid those plain terms by arguing that DLA engaged in discussions with KBR about its TCP, thus requiring a new round of FPRs anyhow.  Putting aside the Court's doubts about the basic premise of that argument, the Court concludes that DLA did *not* engage in discussions with KBR regarding its TCP.

When reviewing KBR's TCP, the government noticed what turned out to be a straightforward and easily explained discrepancy: the numbers in the chart's "annual pay" column did not match the salaries KBR listed in the supplemental materials.  AR 4077–78.  DLA emailed KBR to resolve the inconsistency:  "Based on the supplemental data . . . the hourly rates for the project labor title match but the annual pay does not match. . . . *This should be a simple clarification . . .* to understand the Exhibit 1 annual pay column."  AR 3565 (emphasis added).

KBR responded the next day, explaining that the supporting pay data it provided in the TCP contained higher totals than the annual pay reflected in the table because the supporting data included "non-productive hours" — "a combination of holiday pay and paid time off" — in annual pay, while the table's "annual pay" column included

---

[25] In *VS2, LLC v. United States*, 155 Fed. Cl. 738 (2021), this Court explained *Blue & Gold*, and subsequent Federal Circuit cases applying *Blue & Gold*, in some detail.  Specifically, the Court described how in *COMINT* — and in a more recent case, *Inserso Corp. v. United States*, 961 F.3d 1343 (Fed. Cir. 2020) — the Federal Circuit "shift[ed], *until the contract award date*, the cut-off for a challenge to a solicitation that would not have been possible prior to the proposal due date." *VS2*, 155 Fed. Cl. at 754 (emphasis added).  In *VS2*, the government urged the Court to apply *Blue & Gold* because the plaintiff, VS2, in effect challenged a GAO decision recommending award to another offeror only *after* the agency implemented the GAO's recommendation.  *Id.* at 752–53.  The Court declined to apply *Blue & Gold* because VS2 "*could not have* immediately filed suit challenging" the GAO decision (a non-binding recommendation); there was no agency action to challenge until the agency implemented the GAO's recommendation by making a new award decision.  *Id.* at 756 (emphasis added).  In contrast, *Blue & Gold* applies here because EGS could have challenged Amendment 0007 before award but chose not to do so.

only productive hours.  AR 3564.  The table included non-productive hours in its "Annual Fringe Benefits" column.  AR 3564.  This explanation fully accounts for the immaterial discrepancy.

As explained above, *see supra* Section I.E, to address the discrepancy DLA had identified, KBR provided the government the Corrected TCP, containing a more detailed chart depicting separate columns for "Annual Pay (Productive Hours)" and "Annual Pay (Productive + Non-Productive Hours)."  AR 3564.  In other words, the "Annual Pay (Productive + Non-Productive Hours)" was updated to include the non-productive hours previously included in the "Annual Fringe Benefits" column, which reduced the amounts listed in the Corrected TCP's "Annual Fringe Benefits (Excluding Non-Productive Hours)" column.  AR 3564.  This remedied the discrepancy the government had identified and fully addressed its clarification request.  AR 4076 (Second PET Report) ("Based on the clarification, no additional clarifications were required.").

To be clear, the Corrected TCP altered neither the "Total Annual Compensation" column for Years 2 through 5, AR 3571–72, nor the proposal's proposed prices.  *Compare* AR 2615 (First SSAD) (indicating KBR's pre-TCP price of $38,109,181.90), *with* AR 3614 (Second SSAD) (indicating that KBR's price remained the same).  As noted *supra*, while the "Total Annual Compensation" column for Year 1 in the Corrected TCP reflected slightly different salary amounts for each position, those changes corrected small math errors; they had zero impact on KBR's price proposal and were immaterial in terms of the TCP itself.[26]  Again, offerors were precluded from using the TCPs to change their proposed prices or any other aspect of their proposals.  AR 3480 (Amendment 0007) (providing that the offerors' TCPs were "to *support* the already submitted [FPRs]" and that "[n]o other changes to proposals are permitted" (emphasis added)).

At oral argument, counsel for EGS all but conceded this point in confirming that the sole problem with KBR's initial TCP was that it appeared to contain contradictory numbers.[27]  In asking for this information, the government did not allow, and did not intend to allow, KBR to revise its price, as it may have done in discussions.  *See* FAR 15.306(d) (providing that discussions "are undertaken with the intent of allowing the offeror to revise its proposal").  Instead, the government requested only that KBR reconcile a discrepancy within its TCP.  In sum, DLA did nothing more than "clarify

---

[26] *See supra* n.16.

[27] Tr. 25:7–12 ("THE COURT: So it was a contradiction within the total compensation plan between the two sets of numbers?  [EGS COUNSEL]: There was a contradiction.  THE COURT: And the government said[,] can you explain the distinction?  [EGS COUNSEL]: Exactly, can you explain it.").

certain aspects of proposals . . . or . . . resolve minor or clerical errors," FAR 15.306(a)(2), and, therefore, DLA's subsequent communication with KBR about its TCP was a clarification.

EGS argues, however, that DLA's exchange with KBR constitutes discussions because "KBR revised its proposal . . . by correcting inconsistencies and including additional narrative to explain the changes and KBR's modified proposal."  Pl. MJAR at 17.  The fact that EGS describes the purpose of KBR's TCP changes as "correcting inconsistencies" reveals the minor scale of KBR's changes, which were only to the TCP and not KBR's proposal generally.  Again, KBR's Corrected TCP merely corrected a discrepancy within its TCP.  *See WaveLink*, 154 Fed. Cl. at 270 (labeling a series of proposal revisions as clarifications because the revisions "merely amounted to correcting mistakes that were either clearly clerical or relatively minor errors *or where the information was readily present elsewhere in the proposal*" (emphasis added)); *cf. G4S Tech. CW LLC v. United States*, 109 Fed. Cl. 708, 722 (2013) (concluding that where communications "*merely sought and provided confirmation of information already present* in [a] proposal," they  were "not 'discussions,' [but] [i]nstead, . . . were 'clarifications.'" (emphasis added)).

EGS's argument that KBR's provision of "additional narrative" renders the exchange discussions is similarly unavailing.  Pl. MJAR at 17.  Indeed, the Federal Circuit has held that "[a]ny meaningful clarification would *require* the provision of information[.]"  *ITAC*, 316 F.3d at 1323 (emphasis added).

EGS nevertheless attempts to characterize KBR's Corrected TCP as significant because of the Agency's praise for KBR's corrected fringe rates.  Pl. Resp. at 7.  Specifically, EGS notes that the "original price analysis report" included "no mention of Annual Pay or Fringe Benefits," while the "corrective action PNM" described KBR's salaries and fringe benefits as aligned with market conditions.  *Id.*  As an initial matter, the "original price analysis report" to which EGS cites was signed on October 20, 2020 — almost ten months before DLA issued Amendment 0007 asking for the TCP.  AR 2517 (PET Report of October 20, 2020); AR 3480 (Amendment 0007); AR 3484 (indicating that DLA issued Amendment 0007 on July 15, 2021).  The Court thus fails to understand how the first price analysis report possibly could have analyzed KBR's TCP (including annual pay and fringe benefits).  In other words, there is no reason the Court would find some analysis of planned compensation pre-corrective action.  *See* AR 3480 (noting that, as of July 15, 2021, "[n]either party [had] submitted a total compensation plan with the supporting narrative and data required by FAR 52.222-46").

In any event, the heart of EGS's argument — that "DLA could not have made the finding it relied upon to conclude that KBR's compensation was realistic" until DLA

"permit[ted] KBR to shift Fringe Benefits into Annual Pay," Pl. Resp. at 7 — is unsupported by the administrative record.  EGS points to no evidence in the record that the Agency would have reached a different conclusion based upon the initial TCP (*i.e.*, in the absence of the subsequent clarification).  Indeed, the Agency's evaluation of KBR's initial TCP — written before the clarification — expressly indicates that DLA approved of the salary and fringe benefits in KBR's initial TCP.  AR 4078 (Second PET Report) (noting, on July 27, 2021, that "KBR's total compensation plan that was provided is realistic for the work to be performed and aligns with the supplemental data that was provided. . . . Combined, *the salaries and fringe benefits raise no concerns about KBR's ability to fill the two vacant positions and retain the professionals currently employed*." (emphasis added)).[28]

For the reasons explained above, the Court concludes that the exchange between the government and KBR at issue constituted a clarification, not discussions — and it is not a particularly close call.  Even if it were a closer question, however, the Court would defer to DLA's conclusion in light of its contemporaneous characterization of the exchange as a "clarification."  AR 4075 (Second PET Report) ("This should be a simple clarification with KBR to understand the Exhibit 1 annual pay column."); AR 3565 (email from the government to KBR, noting "[t]his should be a simple clarification with KBR to understand the Exhibit 1 annual pay column."); *see also* Tr. 24:3–6 (EGS counsel conceding that DLA considered the exchange a clarification).  The Court's conclusion, in that regard, is consistent with binding Federal Circuit precedent instructing that we must give deference to an agency's view of an exchange.  *ITAC*, 316 F.3d at 1323 ("[W]e give deference to an agency's permissible interpretation of its own regulations."); *see also, e.g., Davis Boat*, 111 Fed. Cl. at 354 ("Finally, in close cases, it is well-established that the government's classification of a particular communication as a clarification or . . . discussion[s] 'is entitled to deference from the court,' as long as that classification is permissible and reasonable." (quoting *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 717 (2010), *abrogated on other grounds by Safeguard Base Operations, LLC v. United States*, 98 F.3d 1236 (Fed. Cir. 2021)));[29] *Mil-Mar*, 111 Fed. Cl. at 535 ("[T]he agency's

[28] Moreover, even if DLA had needed the information in KBR's Corrected TCP to evaluate it , the subsequent exchange still may have qualified as a clarification.  *See DynCorp. Int'l*, 76 Fed. Cl. at 542 ("If a response to an EN provides information essential to evaluation criteria, increases a past performance score or tips the scales toward the offeror providing the clarification, it still may only be a clarification.").  In this case, however, KBR's additional information did not relate to evaluation criteria, its past performance evaluation, or the best value calculus, and, thus, there is even less reason for characterizing the subsequent exchange as discussions.

[29] The government cites *Davis Boat*, 111 Fed. Cl. at 354, to support its contention that the exchange with KBR was a clarification, Def. Resp. at 4–5.  The Court, however, does not necessarily agree with that decision's conclusion that an agency may accept an extensive,

characterization of an exchange as a clarification is entitled to deference from the court[.]"); *DynCorp Int'l*, 76 Fed. Cl. at 542 ("[F]ollowing *ITAC as it must*, this court resolves very close questions about an EN over an EN, if the EN was intended as a clarification, was labeled as such, did not *clearly* violate the limitations on clarifications expressed in FAR 15.306(a), and did not *clearly* stray into the forbidden zone of discussions described in FAR 15.306(d)." (emphasis added)).

### 3.   The Court Rejects the GAO's Conclusion that the Exchange at Issue Constituted Discussions

EGS brandishes the GAO's December 15, 2021, decision in this case, labeling the exchange at issue discussions.  Pl. MJAR at 17–18.  While the Court often finds GAO decisions helpful and persuasive given its expertise in Federal procurement law, this Court is not bound by GAO decisions, *see Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (citing *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)), and respectfully disagrees with the GAO in this case.

The GAO's decision in this matter presented the facts of the exchange in some detail — reproducing the two tables from KBR's respective TCPs, and quoting excerpts from KBR's narrative — and explained the GAO's legal standards for distinguishing between clarifications and discussions.  AR 4049–52.  As far as the Court can tell, though, GAO's analysis of the particular facts in this case consisted exclusively of the following sentences:

> KBR's contemporaneous response included, as discussed above, a revised exhibit with additional columns, pricing information, and revised pricing totals, and a narrative in an email detailing how its prices were calculated.  That revised exhibit and the accompanying narrative were reviewed and incorporated by the agency in its evaluation documents. *Under these circumstances, we conclude that the communications here ultimately constituted discussions.*"

AR 4052 (emphasis added).

This conclusory holding, however, relies on the phrase "under these circumstances" in lieu of any analysis of the differences between clarifications and discussions as applied to the TCPs.  While the GAO's decision correctly recites the GAO's test for discussions — "whether the agency has provided an opportunity for

---

entirely missing, but required, document from one offeror in order to cure a proposal defect and call it a clarification.  *See Davis Boat*, 111 Fed. Cl. at 354.

proposals to be materially changed," AR 4051 (citing *Priority One Servs., Inc.*, 2001 WL 1872433) — the GAO failed to explain how KBR's updated TCP, including, *e.g.*, the "additional columns," materially altered KBR's proposal. Similarly, the GAO's decision, AR 4052, cites the FAR definition of clarification and establishes that "clarifications are not to be used to . . . revise the proposal," but fails to explain why the exchange cannot be a clarification even under that standard.

### 4.  Clarification Timing — *Dubinsky v. United States*

Throughout briefing and oral argument, neither party raised the holding of *Dubinsky v. United States*, 43 Fed. Cl. 243 (1999).  Nevertheless, because *Dubinsky* may be read as directly addressing the question before the Court, we consider the application of that decision here.

In *Dubinsky*, the procuring agency held discussions with all offerors by sending them letters informing them of proposal deficiencies.  43 Fed. Cl. at 249.  After receiving a response from the eventual awardee — but before receiving responses from the other offerors — an evaluating official telephoned the eventual awardee "to discuss areas of [its] responses that [the official] found to be problematic."  *Id.* at 250.  The eventual awardee addressed those concerns during the telephone call.  *Id.*  In the subsequent bid protest, the protestor alleged that the phone call constituted improper discussions in violation of FAR 15.307(b).  *Id.* at 260.

This Court in *Dubinsky* sided with the plaintiff protestor, holding that the letters the agency sent requesting FPRs constituted discussions, and after an agency engages in discussions, it "generally may not engage in further discussions with any offerors."  43 Fed. Cl. at 261.  Thus, the Court held that the official's telephone call with only the eventual awardee constituted another round of discussions, which the agency denied to the other offerors, thereby violating FAR 15.307(b).  *Id.* at 262; *see also* FAR 15.307(b) (requiring that "[a]t the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision").  This case is clearly distinguishable on the grounds that DLA never sought FPRs in Amendment 0007 or thereafter.

Relevant to this protest, however, the Court in *Dubinsky* further held that the telephone call with the eventual awardee could not have been merely a clarification because of its timing in the procurement process.  43 Fed. Cl. at 262.  Specifically, the Court concluded: "Clarifications . . . are exchanges conducted in procurements where discussions are not expected to be held; the term *has no application to exchanges that occur after discussions have been conducted with offerors*."  *Id.* at 262 (emphasis added).  In other words, *Dubinsky* appears to hold that clarifications can *only* occur in a procurement

where the government has never conducted discussions.  Applying that holding to this procurement — in which the government conducted discussions prior to its contract award decision that preceded corrective action — would mean the exchange at issue cannot, by definition, be a clarification.

The *Dubinsky* decision gives this Court some pause.  Nevertheless, the Court is not persuaded to apply *Dubinsky* here for several reasons.

First, *Dubinsky*'s reading of the applicable FAR provision adds a restriction on agency action not present in the regulation's plain language.  FAR 15.306(a)(1) provides that "[c]larifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated."  The Court reads this to mean that the government is permitted to engage in clarifications *even* when the solicitation at issue anticipates making award without discussions.  *Dubinsky*, in contrast, appears to read that provision as if the word "only" has been inserted between "may" and "occur" (rendering the phrase "clarifications . . . may *only* occur when award without discussions is contemplated").  The Court does not read the regulation's plain language this way.  *See White v. United States*, 543 F.3d 1330, 1337 (Fed. Cir. 2008) ("[I]t is a bedrock canon of statutory construction that our judicial inquiry ends where statutory language is plain and unambiguous.").

Adopting *Dubinsky* here would also create an unduly rigid and restrictive rule, particularly in the context of corrective action, that the FAR does not require.  The following hypothetical demonstrates this point.  Imagine that a procurement involved discussions with all offerors, after which the offerors submitted FPRs, the government made a contract award, and a disappointed offeror protested.  In the protest, the disappointed offeror claims the awardee failed to provide an adequate explanation of the relevancy of its past performance information; so, the agency takes corrective action to allow offerors to submit additional information.  The agency presumably would be able to ask for clarification regarding the additional information concerning relevancy because "the relevance of an offeror's past performance information" is an explicit example of a "clarification."  *See* FAR 15.306(a)(2) ("offerors may be given the opportunity to clarify certain aspects of proposals (*e.g.*, the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond)").  Applying *Dubinsky*, however, would automatically render such an exchange discussions — requiring the agency to allow every offeror to submit another FPR, *see* FAR 15.307(b) — simply because the procurement previously involved discussions.  The Court does not believe that the FAR establishes such a hair-trigger for additional rounds of FPRs.  *Cf. WaveLink*, 154 Fed. Cl. at 272 ("Although the RFP mentioned that . . . clarifications would take place as part of the initial screening period, there is no reason that such exchanges

should be converted into discussions *just because they take place later in the process*." (emphasis added)).[30]

ITAC, a case decided four years after *Dubinsky*, further counsels against our applying *Dubinsky*'s holding regarding the timing of a particular exchange.  In *ITAC*, the Federal Circuit explored "the distinction between 'clarifications' and 'discussions' under the 1997 revision to Subpart 15.3 of the [FAR]."  316 F.3d at 1315.  The Federal Circuit held that a series of ENs the government sent an offeror were not discussions because "the government did not give [the offeror] the opportunity to revise its proposal, and [the offeror] did not change the terms of its proposal to make it more appealing to the government."  *Id.* at 1322.  The court also explicitly warned against applying "cramped conception[s] of 'clarification,'" particularly because one of the "the stated purpose[s] of the 1997 amendments . . . was to '[s]upport[ ] more open exchanges between the Government and industry, allowing industry to better understand the requirement [sic] and the Government to better understand industry proposals.'"  *Id.* at 1323 (third, fourth, and fifth alterations in original) (quoting 62 Fed. Reg. at 51224).

The Court does not believe that requiring agencies to fully re-open discussions following every exchange in a procurement, including those that would otherwise qualify as clarifications, simply because discussions were previously held, "support[s] more open exchanges between the Government and industry."  *Id.* (quoting 62 Fed. Reg. at 51224).  This is particularly true in the context of corrective action, in which agencies will inevitably have simple questions about minor aspects of proposals "to which the offeror has not previously had an opportunity to respond."  FAR 15.306(a)(2). Indeed, applying *Dubinsky* in a case of corrective action, like this procurement, would force agencies to fully re-open discussions each time they had a question — however minor, and including, for example, the "clerical errors" referenced in FAR 15.306(a)(2) — about an offeror's submission, if the corrective action occurred after discussions.  In sum, the Court does not read the FAR to require a new round of FPRs whenever an agency seeks a clarification about a FPR.

---

[30] Even counsel for EGS agreed that the government can seek clarifications on FPRs.  Tr. 21:14–21 ("THE COURT: Let me give you another case.  Let's say the government issues an amendment to a solicitation changing a particular technical criteria and it gives everyone the opportunity to submit a FPR . . . .  Can the government ask for a clarification about the submitted FPRs without reopening discussions?  [EGS COUNSEL]: Absolutely.").

### 5.   Even if the Exchange Between KBR and the Government Was a Discussion, EGS Cannot Demonstrate Prejudice

To demonstrate prejudice, a disappointed offeror must demonstrate that "but for the alleged error, there was a substantial chance that [it] would receive an award." *Allied Tech. Grp.*, 649 F.3d at 1326 (alteration in original) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).  While the Court concludes that the exchange at issue between the government and KBR was a clarification, the Court holds that even if the exchange were discussions entitling EGS to a corresponding proposal revision, EGS would not be able to demonstrate prejudice because:  (1) EGS only would have been able to modify its TCP, which needed no revisions; and (2) EGS has not demonstrated that KBR was somehow unawardable before it clarified its TCP.

### a.   Even If the Government's Exchange with KBR Were a Discussion, EGS Could Only Modify Its TCP Pursuant to Amendment 0007

The FAR, as a general rule, requires the government to hold discussions with all offerors, and allow all offerors to submit FPRs, if it holds discussions with one.  FAR 15.306(d)(1) ("Discussions are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range."); FAR 15.307(b) ("At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision.").  EGS argues, pursuant to these FAR provisions, that the government's "discussion" with KBR about its TCP should have triggered discussions with EGS that should have enabled EGS to revise other aspects of its proposal, like its price in particular.  Compl. ¶¶ 96 ("Despite being in the competitive range, DLA did not provide EGS an equal opportunity to change its prices or total compensation"), 98 ("If DLA had engaged in fair and equal discussions, EGS could have lowered its total compensation and hence its price, resulting in a lower price . . . ."); Pl. MJAR at 23 ("If EGS had been afforded an opportunity to materially change its proposal like KBR, EGS could have removed the $1,855,814" that it proposed as its CLIN 0001 price).

EGS is mistaken for several reasons.

*First*, the record reveals no reason for this Court to conclude that the government would have provided a wider scope for post-TCP submissions than the Agency provided in Amendment 0007 for the TCP itself.  *See* AR 3480 (Amendment 0007) ("No other changes to proposals are permitted.").  EGS's suggestion to the contrary all but necessarily assumes that the government invalidly limited the scope of proposal revisions to begin with.  If EGS wished to challenge the scope of the corrective action to

permit unlimited proposal revisions, however, EGS should have done so prior to submitting its TCP.  *See supra* Section V.A.2.  EGS did not challenge the scope of Amendment 0007, as its counsel conceded at oral argument,[31] thus waiving its objection to the parameters of the corrective action DLA implemented.

*Second*, the government in any event may limit the scope of discussions, and corresponding final proposal revisions, in a variety of circumstances,[32] including those at issue here.

This Court has approved, for example, of an agency's ability to limit the scope of discussions following corrective action.  In *Carahsoft Technology Corp. v. United States*, a GAO "outcome prediction procedure" led to limited corrective action which included "another round of FPRs . . . from both offerors."  86 Fed. Cl. at 334–35.  The corrective action permitted both offerors "unlimited freedom as to the amount they wish to propose from a price standpoint," but disallowed any "technical changes."  *Id.*  The Court noted that the Court of Federal Claims "has recognized that subsequent to an 'outcome prediction,' an agency may re-open a solicitation and *allow offerors to make only limited revisions* to their proposals."  *Id.* at 345 (citing *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 627–29 (2005)).[33]  The Court upheld the limited scope of FPRs, concluding that an "agency may salvage those portions of the procurement untainted by the problems identified in the protest," and that "[e]very problem identified in a procurement does not necessitate an entirely new competition."  *Id.* at 345.  This Court similarly held in *WaveLink, Inc. v. United States* that there is no "*per se* obligation to permit all offerors to submit completely new or amended proposals just because the [a]gency amends a solicitation in some respect" and that, instead, "the degree to which an agency must permit the submissions of revised proposals depends upon whether a protester can show that the addition or deletion of a requirement or evaluation factor somehow prejudiced the protester."  154 Fed. Cl. at 288.

---

[31] Tr. 11:9–11 ("THE COURT:  But you didn't challenge the propriety of this amendment?  [EGS COUNSEL]:  No, we didn't.").

[32] Indeed, at oral argument, counsel for EGS conceded that agencies can limit the scope of FPRs as long as no party is prejudiced by the limitation. Tr. 41:13–18 ("THE COURT: I assume you agree that where the government engages in discussions, it has the discretion to limit the scope of proposal revisions so long as one party isn't prejudiced?  [EGS COUNSEL]: Correct.").

[33] The Court reasoned that the agency's "ability to limit proposal revisions derives, in part, from contracting officials' 'broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.'"  *Carahsoft*, 86 Fed. Cl. at 345 (quoting *DGS Contract Serv., Inc. v. United States*, 43 Fed. Cl. 227, 238 (1999)).

This Court also has held that an agency may conduct post-corrective action discussions with only one offeror.  In *Logistics Health, Inc. v. United States*, 154 Fed. Cl. 51, 80–82 (2021), the Court upheld the agency's post-corrective action discussions with just one offeror when the discussions limited that offeror's revision to the deficiency identified during corrective action.  In upholding the limited discussions, the Court rejected arguments similar to those EGS makes here.  The Court found, for example, that the protestor "had no remaining deficiencies; rather, it merely hoped to have another opportunity to improve its offer."  *Id.* at 80–81.  The Court further explained that the protestor "offers no convincing argument for why fairness requires the Court to grant plaintiff the opportunity to now adjust its price, rather than merely to offer a new program manager, which is all the GAO's corrective action allowed [the awardee] to do."  *Id.* at 81.

This Court specifically has cautioned against allowing unlimited FPRs when the awardee's price has been publicly disclosed.  For instance, in *Caddell Construction Co. v. United States*, 125 Fed. Cl. 30, 55 (2016), *abrogated on other grounds by Sys. Stud. & Stimulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021), the Court ordered the government to cure a misleading round of discussions by providing an offeror — in that case, the awardee — a chance to revise its price after providing the awardee the information previously withheld.  The Court held that reopening discussions to all offerors was "unnecessary" to remedy the error and, moreover, "would cause more harm than good."  *Id.*  Specifically, the Court reasoned that "[t]he other offerors had a fair shot at revising their final pricing proposals, and it would be unfair to give them another bite at the apple, especially given that all the other offerors now know the IG[C]E and [the awardee]'s final award price[.]"  *Id.*  The Court held, instead, that "reopening discussions with all offerors and soliciting revised prices would unfairly harm [the awardee]."  *Id.* at 56.

In light of these decisions, it is clear that DLA permissibly limited the scope of any discussions occurring during corrective action to offerors' TCPs.  In this case, just as in *Carahsoft*, the offerors' failure to submit TCPs was a "problem identified in [the] procurement" that did "not necessitate an entirely new competition."  86 Fed. Cl. at 345.  Instead, DLA permissibly elected to remedy the problem through corrective action consisting of a limited acceptance of additional information necessary to comply with FAR 52.222-46.  Thus, even if the exchange between the government and KBR was a discussion, EGS cannot demonstrate prejudice because its own TCP had no deficiencies.  *See* Pl. MJAR at 20 (referencing "[t]he fact that EGS did not need to make any changes to its TCP"); AR 4072 (Second PET Report) (noting, on July 27, 2021 — two days before the government emailed KBR — that it evaluated EGS's TCP and "[n]o clarifications or discussions are required").  In other words, the most that DLA would have been

required to do here is to provide EGS with an opportunity to further revise its TCP.  But in this case EGS's TCP was not a problem, and was not standing in the way of a contract award; revising it would not have changed the outcome of this procurement.[34]

*Third*, EGS's argument that it would have reduced its overall proposal price if given the opportunity to submit a FPR, *see* Compl. ¶ 100; Pl. MJAR at 23, is particularly unavailing because EGS previously disregarded DLA's advice that EGS should do just that.  As discussed above, the government advised EGS during discussions to lower two of its proposed costs:  (1) its labor rate mark-up, from [ * * * ]% to [ * * * ]%, and (2) its "Material, Travel, and Other ODC" rates, from [ * * * ]% to [ * * * ]%.  AR 1912.  In response, EGS lowered its labor rate mark-up only to [ * * * ]%, not [ * * * ]%, and its Material, Travel, and Other ODC rates to [ * * * ]%, not [ * * * ]%.  AR 2277.  EGS concedes that meeting the government target for its labor rate mark-up alone would have lowered its proposal cost by over $[ * * * ].  Pl. MJAR at 25.  In another instance, the government questioned the nearly $2 million cost EGS — the incumbent — proposed for CLIN 0001, Transition-In.  AR 1912 (providing that "the contract transition should be minimal since EGS is the incumbent" (emphasis added)); *see also* AR 626 (§ L.3.5.2.a.i)

---

[34] EGS also argues that an offeror's "lack of weakness or deficiency is immaterial" to that offeror's right to revise its proposal during discussions.  Pl. MJAR at 20 (citing *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 418 (2018), for the proposition that "[t]o the extent that defendant and [awardee] argue that the FAR permits discussions with only one offeror, during a corrective action taken in response to a bid protest, where the other remaining competitor's proposal contains no weaknesses, significant weaknesses or deficiencies, . . . the court must disagree"); Pl. Resp. at 11 (same).  *Centerra*, however, does not support EGS's position.  In that case, the government moved to remand the case back to the procuring agency so it could reconsider its award decision.  *Centerra*, 138 Fed. Cl. at 410.  The government provided the court with "almost no details" regarding how it would conduct corrective action, which ultimately "consisted of a fundamentally unfair and anti-competitive invitation to [the awardee] to revise its proposal so that Centerra's protest grounds would be rendered moot."  *Id.*  The agency gave Centerra no corresponding opportunity to revise its proposal.  *Id.*  The Court characterized the agency's behavior as "not corrective action, but a mockery of fundamental fairness" and found that the agency "allow[ed] [Centerra's] competitor to redress every flaw in its proposal, as pointed out by the protestor, so that the agency's award decision may withstand review."  *Id.* at 416.  The Court also remarked that it would have rejected the proposed corrective action if the agency had communicated its scope.  *Id.* at 417.  Finally, Centerra protested the corrective action in its protest.  *Id.* at 410.  The facts of *Centerra* render its holding inapposite to the limited scope of corrective action in this case; here, DLA provided offerors equal opportunity to submit a TCP, no other proposal revisions were allowed, and EGS did not object to the scope of the corrective action.  *See* discussion *supra* Section V.A.2; *see also Logistics Health*, 154 Fed. Cl. at 80 (describing *Centerra*'s holding as a "fact-dependent determination" and finding that the case does not "establish[] a rule for how this Court should treat corrective action resulting from government error in the evaluation process, particularly as similar corrective action was approved in *Caddell*" and other cases).

(noting, regarding CLIN 0001, that offerors "may propose zero cost if there is no cost"). EGS conceded as much at oral argument.  Tr. 42:16–18 ("THE COURT: But you agree that [EGS] had the chance to address its higher price with the first FPR?  [EGS COUNSEL]: Yes, it did have that option."); Tr. 46:13–15 ("THE COURT: And the price you already had a chance to correct.  [EGS COUNSEL]: Right, we did.").

EGS, however, chose to keep its transition cost in its updated proposal.  AR 2280. EGS is essentially asking for "another bite at the apple," *Caddell Constr.*, 125 Fed. Cl. at 56, but only after refusing the first.  In addition to the unfairness of allowing a disappointed offeror to lower its price after seeing the awardee's price, *see id.* at 55–56, the Court finds that EGS was prejudiced here, if at all, *not* by DLA's actions, but rather by EGS's *own* failure to lower its price when it had the chance to do so.  Put differently, KBR never received an opportunity to adjust its proposal price that EGS did not also have.  Both offerors submitted FPRs; EGS just wants another chance to get it right.

For the above reasons, the Court finds that — even if the exchange between KBR and the government were discussions — the government permissibly limited the scope of discussions to the offerors' TCPs, and EGS cannot demonstrate prejudice.[35]

### b.  The Administrative Record Does Not Support EGS's Assertion that KBR's Proposal Was Unawardable Before the Clarification

EGS also cannot demonstrate prejudice because there is no evidence that KBR's initial TCP rendered its proposal unawardable, as EGS claims.  *See* Compl. ¶¶ 90, 93–94; Pl. Resp. at 13–14 ("KBR's proposal was unacceptable because its July 26 TCP proposed Fringe Benefits that were not comparable to 'market conditions' and not 'notably similar' to the Fringe Benefits proposed by EGS and found in the IGCE." (quoting AR 3624 (PNM))).[36]

---

[35] The GAO came to the same conclusion.  AR 4053 (GAO Decision of Dec. 15, 2021) ("Even if the agency had also opened discussions with EGS, as it did with KBR, the protester has not established that the agency would have been required to allow EGS to revise other areas of its proposal, such as its proposed transition-in costs. Therefore, while we find that the agency engaged in discussions with the awardee, this issue is insufficient to sustain the protest because of a lack of competitive prejudice to the protester.").

[36] The PNM actually reads that "there was *notable similarity* in the fringe benefits," not that the fringe befits were "notably similar," as EGS quotes the document.  AR 3624 (emphasis added). *Compare* AR 3624 (PNM), *with* Pl. Resp. at 9, 14.  Not a material discrepancy, to be sure, but the Court notes it, nevertheless.

EGS provides no proof, or even any suggestion, from the record that KBR's proposal was somehow unawardable based on the quality of KBR's initial TCP standing alone. *See* Compl. ¶¶ 90, 93–94; Pl. Resp. at 13–14 (citing the PNM for the proposition that KBR's proposal was awardable *after* its Corrected TCP). When asked at oral argument to identify where the record indicates that KBR's original TCP was insufficient to make KBR's proposal awardable, counsel for EGS was unable to do so. Tr. 75:9–10 ("THE COURT: Did [DLA] ever say [KBR's proposal] was unawardable? [EGS COUNSEL]: It does not say it's unawardable[.]")

Indeed, if anything, DLA's July 27, 2021, evaluation of KBR's initial TCP indicates that KBR's proposal was awardable even before the clarification:

> KBR's total compensation plan that was provided is realistic for the work to be performed and aligns with [the] supplemental data that was provided. . . . While having [sic] a clarification from KBR is needed, the benefits discussed align with the private sector. The salaries are within the ranges provided in the supporting documentation, and the fringe benefits are comprehensive. Combined, the salaries and fringe benefits *raise no concerns about KBR's ability to fill the two vacant positions and retain the professionals currently employed.* The position descriptions and supporting documentation *raise no concerns about KBR's ability to perform the requirements of the PWS.*

AR 4078 (Second PET Report) (emphasis added). The Second PET Report repeated much of this analysis after receiving KBR's Corrected TCP. *See* AR 4078 (including both the PET's pre-clarification and post-clarification analysis of KBR's TCP). The fact that the Agency was able to repeat much of its analysis is yet further indication that KBR's Corrected TCP was not central to KBR's receiving the award.

### 6. DLA Did Not Conduct Misleading Discussions with EGS Regarding Its CLIN 0003 Pricing

EGS argues that DLA "engaged in misleading discussions with EGS" during the initial, pre-corrective action award phase. Pl. MJAR at 23. Specifically, EGS argues that: (1) DLA's "Negotiation Target" for EGS under CLIN 0003, Preventive Maintenance, was $[ * * * ], which is approximately $[ * * * ] less than EGS's proposed price for CLIN 0003; (2) DLA never told EGS of this target, and instead only asked EGS to lower its prices by various percentages that would not enable EGS to meet the negotiation target; and (3) EGS "lowered its rates as suggested by DLA," but "[e]ven with these reductions, the

price difference . . . remained over $8 million." *Id.* at 24–25.  This argument does not appear in EGS's complaint and is not related to EGS's central contention in Count One that DLA failed to conduct equal discussions during corrective action.  Nevertheless, the Court examines the argument and finds it to be without merit.

As an initial matter, the administrative record supports EGS's claim that DLA failed to inform EGS of the "negotiation target" for CLIN 0003 and instead advised EGS to reduce its price by various percentages.  *See* AR 4063 (Second PET Report) (listing CLIN 0003 "negotiation targets" for each offeror, including one of $[ * * * ] for EGS); AR 1912 (EGS ENs) (showing that the government advised EGS to lower its labor rate mark-up down to [ * * * ]%, from [ * * * ]%, and to lower its ODC rates to [ * * * ]%, from [ * * * ]%).  EGS, however, cites no legal authority to support the contention that DLA's strategy of suggesting reduced rates constituted misleading discussions.  Indeed, EGS's argument fails to meet the standard for misleading discussions, which "are characterized by communications from the government that are incorrect, confusing or ambiguous."  *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 670 (2010); *see also Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 20 (2019) ("Additionally, discussions are misleading 'when the agency misdirect[s] the protestor as it revises its proposal.'" (alteration in original) (quoting *Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017))), *aff'd*, 959 F.3d 1379 (Fed. Cir. 2020).

EGS points to no evidence that DLA provided any "incorrect, confusing[,] or ambiguous" information regarding EGS's CLIN 0003 price.  *DMS All-Star*, 90 Fed. Cl. at 670.  To the contrary, DLA unambiguously recommended that EGS reduce its price for that CLIN.  AR 1912 (EGS ENs).  Even worse for EGS, it chose to not meet the government's suggested price cuts.  *See* Pl. MJAR at 24 (conceding that "EGS lowered its mark up of its Material, Travel, and Other ODCs to [ * * * ]%," not [ * * * ]%, "and lowered its labor rates from [ * * * ]% to [ * * * ]%," not [ * * * ]%).  In EGS's own words, it lowered its price by "approximately [ * * * ]" but fell more than $[ * * * ] shy of the government's recommendations.  *Id.* at 25 ("The difference of [ * * * ]% lower for EGS's labor rates, would have amounted to an approximate reduction of $[ * * * ] in EGS's overall price.").  The fact that EGS fell short of DLA's price reduction recommendations by more than [ * * * ]% undercuts EGS's argument that DLA's discussions regarding price were misleading — it indicates, instead, that EGS disregarded the government's expressed concerns.

Moreover, under the circumstances of this case, the Court is unconvinced that DLA had any duty to mention EGS's CLIN 0003 price in discussions.

The law is clear that contracting officers have a great deal of discretion regarding the content and method of discussions.  FAR 15.306(d)(3) ("[T]he contracting officer is not required to discuss every area where the proposal could be improved.  The scope and extent of discussions are a matter of contracting officer judgment.").  The Federal

Circuit unequivocally reaffirmed this discretion in *JWK International Corp. v. United States*, holding:

> All aspects of the discussions, their subject, breadth, and extent, are within the purview of the contracting officer. Under the regulation, aside from areas of *significant weakness or deficiency*, the contracting officer need not discuss areas in which a proposal may merely be improved. Therefore, absent bad faith or an abuse of discretion, the contracting officer need not conduct discussions.

279 F.3d 985, 988 (Fed. Cir. 2002) (emphasis added) (citation omitted).

In *JWK*, the Federal Circuit upheld an agency's decision not to hold discussions on the offerors' cost proposals when the agency rated both cost proposals as "adequate." 279 F.3d at 987. This Court similarly has confirmed contracting officer discretion regarding discussions. *See, e.g.*, *Lyon Shipyard, Inc. v. United States*, 113 Fed. Cl. 347, 356 (2013) (holding that agencies only need to discuss an offeror's proposed price if the price "would preclude award to the firm" (quoting *DMS All-Star*, 90 Fed. Cl. at 669)); *IAP Worldwide Servs.*, 2022 WL 1021781, at *40(holding "where an agency has not assessed a proposal with a deficiency or significant weakness, the government is not required to engage in discussions with that offeror").

In this case, EGS's price did not "preclude award" to EGS. *Lyon Shipyard*, 113 Fed. Cl. at 356. To the contrary, the PET found that EGS's initial proposal costs "appear[ed] to align to the IGCE." AR 2525–29 (PET Report of October 20, 2020) (noting, instead, that discussions were only necessary "to ensure there is an understanding of how the proposed prices were established"); *see also* AR 2614–15 (First SSAD) (finding that EGS's proposal was 3.8% less than the IGCE).

Considering that EGS's pricing did not constitute a proposal deficiency or significant weakness, DLA may not have been required to discuss pricing with EGS at all. *See JWK*, 279 F.3d at 988. In any event, the Court finds that DLA's discussions with EGS regarding its CLIN 0003 pricing were not misleading.

For the above reasons, the Court rejects all of EGS's claims as to Count One.

**B. The Government Did Not Fail to Evaluate the Price Disparity Associated with Transition-In Costs, Did Not Fail to Engage in Meaningful Discussions Regarding Transition-In Costs, and Did Not Engage in Disparate Treatment (Count Two)**

As described above, the Solicitation's first CLIN, "Transition-In Plan," establishes a 90-day transition period at the beginning of the new contract in order to minimize

performance delays.  AR 1330 (PWS).  EGS makes three related arguments regarding CLIN 0001:  (1) the Agency failed to properly evaluate the offerors' approaches to CLIN 0001 (Transition-In), Compl. ¶¶ 104–109, 129–30; Pl. MJAR at 28–30; (2) the Agency failed to engage in meaningful discussions regarding transition-in costs because if it did, it would have either advised EGS to remove its transition-in costs or removed the costs directly, Compl. ¶¶ 109–122, 126–28, 131; Pl. MJAR at 31–32; and (3) the Agency engaged in disparate treatment regarding transition-in costs by requiring EGS to explain its higher price but failing to require KBR to explain *its* significantly lower price and potentially greater risk, Compl. ¶¶ 124–25; Pl. MJAR at 30–31.  None of these arguments have merit.

### 1.   The Government Properly Evaluated the Price Disparity Associated with Transition-In Costs

First, EGS argues that DLA "never analyzed the differences" between the two offerors' approaches to CLIN 0001 and never analyzed "what the different approaches meant for the agency."  Pl. MJAR at 28.  The administrative record, however, indicates that DLA rigorously analyzed the different approaches.

One obvious difference DLA identified was the price for CLIN 0001 — EGS proposed a price of $1,855,814.80, while KBR proposed a price of $[ * * * ].  AR 3611 (Second SSAD).  During the first round of discussions, DLA questioned why EGS, as the incumbent contractor, proposed such a high transition-in cost.  AR 1912 ("Looking at the CLIN 0001 (Transition In) cost, how was the $[ * * * ] calculated? . . . [T]he labor for transition seems high with no understanding of how that cost was calculated since *the contract transition should be minimal since EGS is the incumbent*." (emphasis added)).[37] EGS responded "that *it did not have any transition-in costs*."  Compl. ¶ 107 (emphasis added).  Nevertheless, EGS proposed a transition cost over $1.8 million; it "used the figure of $1,855,814.80 to represent a quarter of its proposed first year price . . . *i.e.*, a price to assist DLA with the approximate three (3) month gap between the end of the prior contract . . . and the beginning of the new contract."  *Id.* ¶ 107; AR 1926 (EGS

---

[37] The language of CLIN 0001, which indicates quite clearly that the incumbent contractor should have no transition costs, justifies DLA's questions.  AR 1330 (PWS) (providing that the "Predecessor Contractor" would "retain full responsibility for tasks and deliverables" throughout the transition and that the awardee would assume responsibility only *after* the transition period).  As noted above, the Solicitation also allowed offerors to propose no transition costs if they would realistically incur none.  AR 626 (§ L.3.5.2.a.i) ("The Offeror may propose zero cost if there is no cost[.]").

Response to ENs) ("There is no additional costs [sic] as EGS is the incumbent, just the costs of 3 months of performance.").

The Second PET Report explained the implications of EGS's proposed transition cost:

> EGS explained their CLIN 0001 is based on how the current cost-plus fixed fee for AFHE maintenance is completed. If EGS, who currently holds the cost-plus fixed fee contract has its three-month option exercised, then the cost for this implementation will be zero. However, [if] the three-month option is not exercised, then the CLIN 0001 cost will be as stated in their proposal.

AR 4068.

KBR, in contrast, did not factor any award delay into its CLIN 0001 cost, nor did KBR propose any cost for [ * * * ] during the transition. AR 2433 (KBR Response to ENs). The government initially expressed concern about KBR's low transition cost. AR 4062 (Second PET Report) ("KBR's proposed price [for CLIN 0001] . . . is nearly [ * * * ]% lower than the incumbent, which leads to questions about why the proposed price is so much lower compared to the incumbent and why the incumbent is so much higher than another proposal."). The government inquired about this during discussions. AR 2433 ("Does Transition In really have [ * * * ] costs associated with that CLIN?"). KBR responded by (1) explaining that "KBR did not include any [ * * * ] costs into [the] Transition In CLIN" because "it is KBR's understanding that [the] Predecessor[ Contractor]'s full responsibility for tasks and deliverables includes providing any necessary [ * * * ]," and (2) citing the Solicitation provision placing all responsibility for tasks and deliverables during the transition period on the incumbent contractor. AR 2433.[38]

The government analyzed, and was satisfied with, KBR's response:

> For CLIN 0001, which is a one-time cost, KBR's price of $[ * * * ] includes all set-up and transition actions required to start performing on the contract after the 90-day transition period. KBR's price is nearly [ * * * ] of the price of EGS and EGS is the incumbent. During negotiations, KBR confirmed

---

[38] This alone disproves EGS's contention that the Agency "never made KBR justify how it could perform transition-in without [ * * * ]." Pl. MJAR at 29.

their CLIN 0001 price and indicated in their informal breakdown of the actions that were comprised into their development of CLIN 0001.  Based on their technical proposal and that there are no outstanding weaknesses, deficiencies, or uncertainties, *KBR has a clear understanding of what is needed to perform*.

AR 3625 (PNM) (emphasis added).

In other words, a simple review of the record thoroughly disproves EGS's claim that "DLA never reconciled or considered that EGS's and KBR's approaches and strategies were completely different."  Pl. MJAR at 29; Compl. ¶ 109.  Indeed, EGS's own complaint and MJAR reference DLA's analysis.  Compl. ¶ 106 (alleging that the Second PET Report "noted the large price disparities and questioned KBR's price"); Pl. MJAR at 28 (referencing the "round of discussions held with EGS" regarding EGS's CLIN 0001 cost); *id.* at 29 (referencing the fact that "KBR explained its low proposed price for CLIN 0001" to DLA (citing AR 2433, KBR Response to ENs)).  In sum, the Court finds no support for EGS's claim that the Agency failed to consider the offerors' different approaches to CLIN 0001.

EGS further argues that DLA should have, but never, "advised EGS during discussions that [EGS] did not need to include an anticipated delay . . . as part of its transition-in costs."  Pl. MJAR at 29.  The Court disagrees; as explained above, the Agency advised EGS of exactly that concern during discussions.  *See* AR 1912 (EGS ENs) (informing EGS, *inter alia*, that "*the contract transition should be minimal since EGS is the incumbent*" (emphasis added)).  EGS has only itself to blame for failing to heed DLA's warnings to reduce transition-in costs.  *See Carahsoft*, 86 Fed. Cl. at 343 ("[A]n agency is not required to 'spoon-feed' offerors in order to have meaningful discussions.").  In sum, the Court agrees with KBR's characterization of EGS's final CLIN 0001 price:  "EGS made the business decision to include $1,855,814.80 in its final price proposal."  KBR MJAR at 24.

## 2.   The Government Did Not Engage in Disparate Treatment

Next, EGS argues that the Agency engaged in disparate treatment regarding transition-in costs.  Pl. MJAR at 30.  This claim is also meritless.

The Federal Circuit recently articulated the two-part standard for a disparate treatment claim; a plaintiff protestor must show either:  (1) "that the agency unreasonably downgraded [the protestor's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other

proposals"; or (2) "that the agency inconsistently applied objective solicitation requirements between [the protestor] and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020); *see also Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 693–95 (2022) (rejecting disparate treatment argument pursuant to the *Office Design Group* standard); *IAP Worldwide Servs.*, 2022 WL 1021781, at *30–32 (same).

Despite the fact that EGS does not cite this binding standard in any of its briefs,[39] this Court interprets EGS's argument as falling under the first prong of the *Office Design Group* standard. *See* Pl. MJAR 30–31 (arguing that "DLA held EGS to a different standard by requiring EGS to explain its higher price but failing to require KBR to explain its significantly lower price and potentially greater risk").

EGS defeats its own disparate treatment claim by repeatedly arguing in its own briefs that the proposals were *not* similar. Pl. MJAR at 28 ("For CLIN 0001, Transition-In, EGS and KBR proposed *entirely different approaches* and strategies as reflected in their proposed prices and accompanying explanations. . . . Despite the *significant differences*, DLA never analyzed the differences . . . . The disparity in the two proposals was so stark . . . ." (emphasis added)); *id.* at 29 (asserting that "EGS's and KBR's approaches and strategies were *completely different*" (emphasis added)).

The record supports EGS's characterization. *See* AR 1926 (EGS Response to ENs) (describing that "EGS calculated the total cost for the first 12 months of the contract and then divided by 4 to arrive at a price for the 3 month (1/4 of a year) transition period"); AR 2433 (KBR Response to ENs) ("[I]t is KBR's understanding that [the] Predecessor[ Contractor]'s full responsibility for tasks and deliverables includes providing any necessary [ * * * ] for services performed through the end of their period of performance. Therefore, KBR did not include any [ * * * ] cost into [the] Transition In CLIN."); *see also* discussion *supra* Section V.B.1 (finding that the Agency thoroughly evaluated the differences in the offerors' proposals regarding CLIN 0001).

Accordingly, the Court finds no merit to EGS's self-contradictory claim of disparate treatment and rejects it.

---

[39] *See generally* Pl. MJAR; Pl. Resp. *Contra* Def. MJAR at 29–30 (citing *Office Design Group*). EGS instead paraphrases, and arguably misstates, a standard from a Court of Federal Claims case decided before *Office Design Group*: "It is axiomatic that agencies must treat prospective offerors in a fair and consistent fashion." Pl. MJAR at 30 (citing *Afghan Am. Army Servs. Corp. v. United States*, 106 Fed. Cl. 714, 729 (2012), for the proposition that "an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently"). In any event, this Court is bound by the *Office Design Group* standard and applies it here.

**3.   The Agency Was Not Required to Give EGS the Opportunity to Remove Its Transition-In Costs During Corrective Action or to Otherwise Ignore the Costs EGS Proposed**

Finally, EGS argues that DLA failed to conduct meaningful discussions with EGS regarding EGS's transition costs and, alternatively, that DLA should have removed EGS's transition costs.  Both arguments fail.

EGS's first argument is that "[d]uring corrective action, DLA had every opportunity to engage in discussions with EGS, just as it did with KBR" and should have "allow[ed] EGS an opportunity to change its pricing for CLIN 0001."  Pl. MJAR at 31.  As discussed above, this argument fails because:  (1) the exchange between KBR and the government during corrective action was a clarification, not a discussion, and thus did not entitle EGS to additional proposal revisions; and (2) even if the exchange were a discussion, the Agency properly limited the scope of corrective action to revising the TCPs, which provided EGS no opportunity to revise its CLIN 0001 pricing.  *See* discussion *supra* Section V.A.[40]

EGS next argues that DLA "removed all transition-in costs from [EGS's proposal in] the Interim Support contract," Pl. MJAR at 29 n.3, and thus should have "removed transition-in costs from EGS's proposal" in this contract, *id.* at 30.  The Court struggles to understand EGS's argument.  In any event, there is no administrative record evidence to support this argument because no documents address any interim bridge contract.  Counsel for EGS conceded this at oral argument.  Tr. 89:7–14 ("THE COURT: [I]t sounds like none of this is in my record.  [EGS COUNSEL]: It's not.").[41]

For the above reasons, the Court rejects all of EGS's claims as to Count Two.

---

[40] To the extent that EGS argues that the "$1,855,814 [that EGS proposed] for delay costs amounts to a deficiency or material mistake in EGS's proposal that DLA considered during the corrective action evaluation," and thus entitled EGS to additional discussions, Pl. MJAR at 31, the Court finds, again, that DLA *did* raise this issue with EGS during discussions, and EGS simply chose to ignore it, *see* AR 1912 (EGS ENs) (noting, *inter alia*, that "*the contract transition should be minimal since EGS is the incumbent*" (emphasis added)).

[41] *See also* Tr. 88:10–19 ("THE COURT:  How did they do it in the bridge contract?  First of all, is any of that in the record, the bridge contract materials?  [EGS COUNSEL]:  I asked for it to be in the record, but they wouldn't allow us to have it in the record.  THE COURT: And you didn't file a motion to make them, so I don't have any of that information.  I don't know what I'm supposed to do with any of that.").

## C.  The Government Reasonably Evaluated KBR's TCP Pursuant to FAR 52.222-46 (Count Three)

EGS characterizes Count Three as a cohesive claim that DLA conducted an improper price realism analysis.  Compl. at 25 ("DLA Failed to Properly Evaluate the Price Realism of KBR's Proposed Professional Employees Under FAR 52.222-46" (capitalization altered)).  There are two problems with this description.  First, FAR 52.222-46 requires a *compensation* realism analysis, not a *price* realism analysis.  *See, e.g.*, *Eskridge & Assocs.*, 955 F.3d at 1346.  Second, most of EGS's arguments within Count Three are completely unrelated to either price realism or compensation realism.  Nevertheless, the Court addresses each argument in turn and finds them all to be without merit.

### 1.  Price Realism and Compensation Realism Analyses — General Principles

A price realism analysis is an agency's evaluation of an offeror's overall price conducted to ensure that the price is not so low as to threaten contract performance. *See, e.g.*, *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1363 (Fed. Cir. 2021) (describing an agency's determination "whether [prices] were unreasonably low" as "price realism"); *DMS All-Star*, 90 Fed. Cl. at 663 ("A 'price realism analysis,' a term not employed in the FAR, examines the performance risk of proposals in a fixed-price contract procurement, *with particular attention to the risk of low-priced proposals*[.]" (emphasis added)); Vernon J. Edwards, *Price Realism: A Primer*, 28 Nash & Cibinic Rep. NL ¶ 1 (Jan. 2014) ("Price realism analysis is done in fixed-price acquisitions to determine whether a price is unrealistically low and to what degree, and to figure out why it is low so that risk can be properly assessed.").

In contrast to a price realism analysis, a *compensation* realism analysis per FAR 52.222-46, *see supra* Section V.A.2, is narrower and involves only "evaluat[ing] whether a[n offeror's] *proposed compensation* is too low."  *Eskridge & Assocs.*, 955 F.3d at 1346 (emphasis added); *see also Sparksoft Corp.*, 141 Fed. Cl. at 627 (holding that FAR 52.222-46 imposed on an agency "an obligation to undertake a realism analysis of the professional compensation rates"); *Abacus Tech. Corp.*, 2020 WL 1547463, at *4 n.2 (holding that FAR 52.222-46 requires, "in effect, a price realism evaluation regarding an offeror's proposed compensation").

DLA inaccurately described the analysis necessitated by FAR 52.222-46 as a price realism analysis.  *See* AR 3480 (Amendment 0007) ("Neither party submitted a [TCP] with the supporting narrative and data required by FAR 52.222-46 to permit the *price*

*realism analysis* required by the clause." (emphasis added)).  EGS appears to have followed DLA's lead.  *See* Compl. ¶ 136–37 (alleging that DLA failed "to conduct a price realism analysis of professional employees as required under FAR 52.222-46").[42]

Pointing out this inaccuracy may seem pedantic, but the difference between the two types of analyses is significant.  Price realism requires an agency to evaluate offerors' pricing (*i.e.*, the amount the government will be charged), whereas the narrower compensation realism analysis focuses on the possible impact to the government of paying employees too little; relatedly, FAR 52.222-46 is also intended, in part, as a worker-protection provision:

> [T]he clause is designed to afford professional services employees protections mirroring those afforded other workers under the [SCA].  The primary purpose of the SCA is to protect "wage standards of employees" by preventing "federal purchasing power [from] playing a role in suppressing wage rates," with particular emphasis given to the impact of that power in rebiddings and successor contracts.

*CRAssociates*, 95 Fed. Cl. at 370 (third alteration in original) (footnote omitted) (quoting *Ft. Hood Barbers Ass'n*, 137 F.3d at 309).

Despite the parties' imprecise phrasing, the Court finds that DLA properly evaluated KBR's TCP pursuant to FAR 52.222-46.

## 2.  DLA Reasonably Evaluated KBR's Proposed Professional Compensation Pursuant to FAR 52.222-46

FAR 52.222-46(a) requires the government to evaluate TCPs to ensure that they "reflect[] a sound management approach and understanding of the contract requirements," and to consider the proposed compensation "in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation."  FAR 52.222-46(a); *see also CSC Gov't Sols., LLC v. United States*, 129 Fed. Cl. 416 (2016) ("[B]ased on the text of [FAR 52.222-46], the procuring agency must conduct a rational analysis of the realism of the offerors' proposed salaries with regard to program continuity, retention, and 'uninterrupted high-quality work.'" (quoting

---

[42] *See also* Pl. MJAR at 34 ("The evaluation documents do not show DLA conducted a price realism analysis as required by FAR 52.222-46[.]"); Pl. Resp. at 10 ("The sole purpose of the TCP was to allow DLA to perform a price realism analysis as required by FAR 52.222-46.").

*OMV Med., Inc. v. United States*, 219 F.3d 1337, 1339 (2000))).  EGS seizes upon some of the language in FAR 52.222-46(a), arguing:  (1) that the Agency failed to "indicate that it considered whether KBR proposed a 'sound management approach,'" Pl. MJAR at 34 (quoting FAR 52.222-46(a)); and (2) that DLA failed to analyze "whether the compensation [KBR is paying] its current employees will ensure 'uninterrupted high-quality work' or whether placing these employees in new roles will" harm retention. Pl. MJAR at 35 (quoting FAR 52.222-46(a)).

The Second PET Report, however, reflects the Agency's due and reasonable consideration of these factors for KBR's proposal, finding, *inter alia*:  (1) the professional positions' "salaries with fringe benefits indicate the capability of the proposed compensation structure to *obtain and keep suitable qualified personnel* to meet mission objectives"; (2) "the differences in skills, the complexity of various disciplines, and professional job difficulty have been evaluated and considered"; and (3) "[t]he position descriptions and supporting documentation *raise no concerns about KBR's ability to perform the requirements of the PWS*."  AR 4078 (emphasis added).  The Second PET Report thus shows that DLA also evaluated KBR's TCP and found that it reflected an "understanding of the contract requirements," as required by FAR 52.222-46(a).  The PNM reflects similar considered analysis.  AR 3624 ("Also, eight of KBR's ten professional employees are already employed, *mitigating any risk* of KBR having the personnel necessary to perform when it replaces the incumbent."  (emphasis added)). Accordingly, EGS's arguments regarding FAR 52.222-46(a) fail.

FAR 52.222-46(b) reiterates the importance of employee retention.  FAR 52.222-46(b) (providing that proposed compensation levels "should reflect a clear understanding" of contract work and "should indicate the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mission objectives").  Similarly, that subparagraph notes that offerors proposing lower compensation than that of the incumbent "will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees."  *Id.*  Relatedly, "[o]fferors are cautioned that lowered compensation for essentially the same professional work may indicate lack of sound management judgment and lack of understanding of the requirement."  *Id.*

EGS relies on FAR 52.222-46(b) to claim that DLA was required to "compare the incumbent EGS rates [with] the KBR proposed rates."  Pl. MJAR at 36.  Over time, this Court has been inconsistent regarding whether this provision *requires*, or merely encourages, an agency to directly compare proposed salaries with incumbent salaries. *Compare CRAssociates*, 95 Fed. Cl. at 371 (Allegra, J.) (holding that the provision requires agencies to compare offerors' proposed salaries to the incumbent's salaries, because "[a]lthough not exactly plain, the clause's language certainly infers the need for such a

comparison as it requires the agency to perform additional analysis when an offeror's compensation levels are lower than those paid by the incumbent"), *with CSC Gov't Sols.*, 129 Fed. Cl. at 432 n.15 (Lettow, J.) (declining to apply *CRAssociates* because "[u]nless the RFP directs the procuring agency to perform its analysis according to a particular process or formula, a rational evaluator only needs to follow the general guides regarding compensation rate evaluations as set forth in FAR 52.222-46").[43]

This Court need not definitively interpret this aspect of FAR 52.222-46, however, because DLA adequately and reasonably compared the proposed compensation plans, to include the incumbent's.  AR 3612 (Second SSAD) ("Although KBR proposed [ * * * ]% lower salary for the Project Manager and KBR proposed lower salaries for at least three of their professional employees, their proposed compensation was still within the range of similarly situated professionals in the commercial marketplace as evidenced by their supporting data.").  In other words, DLA met the requirements of FAR 52.222-46 as *CRAssociates* explained them; DLA compared KBR's proposed compensation with EGS's proposed compensation, the first *CRAssociates* prong, and found KBR's proposed compensation realistic, the second *CRAssociates* prong. *CRAssociates*, 95 Fed. Cl. at 371.

EGS asserts that DLA violated FAR 52.222-46 because DLA "never evaluated or even considered whether imposing greater oversight responsibilities" on KBR's professional employees by [ * * * ] its technicians "would impact KBR's Technical Approach or negatively affect its understanding of the requirements."  Pl. MJAR at 33–34.  EGS never ties this hypothesis — that [ * * * ] some of KBR's *non-professional* employees would impact performance of its *professional* employees — with the language or requirements of FAR 52.222-46.  Indeed, this argument appears to be nothing more

---

[43] The cases also differ in the application of a Federal Circuit case, *OMV Medical, Inc. v. United States*, 219 F.3d 1337 (Fed. Cir. 2000), in which "the Federal Circuit interpreted a predecessor version of the clause in question."  *CRAssociates*, 95 Fed. Cl. at 371.  In *CRAssociates*, Judge Allegra held that *OMV* requires agencies "to make two separate determinations":  (1) "whether each offeror's compensation package was generally consistent with the [incumbent's] salaries"; and (2) "whether each offeror's compensation plan was realistic, *i.e.*, whether it indicated that the offeror understood the scope of the work."  *Id.*  In *CSC Government Solutions*, in contrast, Judge Lettow found that *OMV* "does not lay out a mandatory two-prong framework" for FAR 52.222-46 analyses; instead, "the two-step analytical method addressed in *OMV was advanced by [the agency]* in the RFP *for the procurement at issue* in that case."  129 Fed. Cl. at 432 (emphasis added) (noting that the Federal Circuit held in *OMV* that the predecessor version of FAR 52.222-46 generally "does 'not require the preparation of minimum acceptable salary levels' and 'nothing prohibit[s] the [government] from awarding the contract to an offeror with salary levels lower than the minimum salary levels' derived from incumbent rates" [alteration in original] (quoting *OMV*, 219 F.3d at 1344)).

than an attack on the Agency's technical evaluation, but without reference to any such evaluation criteria or documents.  The Court therefore rejects this argument to the extent it challenges DLA's compensation realism analysis.  To the extent the argument attempts to reframe EGS's problems with KBR's technician [ * * * ], the Court finds that the record, again, clearly explains and adequately supports the Agency's evaluation of KBR's proposed [ * * * ].[44]

Finally, the Court holds that the Agency's analysis of the TCPs did not "parrot[]," Pl. MJAR at 34, the requirements of FAR 52.222-46 but instead constituted the thoughtful analysis required.

For these reasons, the Court finds that DLA conducted a valid compensation realism analysis pursuant to FAR 52.222-46.

### 3.   The Court Rejects EGS's Remaining Arguments as Unsupported by the Administrative Record or Because They Reflect a Mere Disagreement with the Agency's Considered Judgment

The remaining arguments EGS deploys constitute a miscellany of assorted grievances with the procurement, all of which are either unsupported by the record or amount to mere disagreement with the Agency's considered judgment — a legally insufficient ground for protest.  *See, e.g.*, *E.W. Bliss Co.*, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003) ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably" (quoting *Carlson Wagonlit Travel*, B-287016, 2001 CPD ¶ 49, 2001 WL 254317 (Comp. Gen. Mar. 6, 2001))), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004); *Harmonia Holdings Grp., LLC v. United States*, 152 Fed. Cl. 97, 111 (2021) ("[Plaintiff protestor] may disagree with the agency's assessment, but such a disagreement does not allow a court to displace the reasoned and rational judgment of the agency.").

---

[44] *See* AR 2557 (TET Report) (concluding that KBR's responses to Agency questions on KBR's staffing plan provided "sufficient detail [to] demonstrate[] that KBR has an adequate understanding of the requirements and will be able to . . . meet the requirements of PWS Section 5.1."); *see also* AR 3623–24 (Second SSAD) (explaining, under a "Price Realism" subheading, that (1) the Agency conducted a second round of discussions with KBR regarding KBR's understanding of the PWS, (2) the Agency consulted the TET after KBR disclosed its [ * * * ] plan, and (3) the TET found the plan "to be acceptable since the solicitation did not require technicians [ * * * ]").

For example, EGS contends DLA should have lowered KBR's rating of "Good" under Factor 1, Technical Approach, because KBR proposed lower salaries than did EGS for at least four of its professional employees. Pl. MJAR at 33. The record, however, shows that the Agency took KBR's lower salaries into consideration in awarding KBR its "Good" rating. AR 3612 (Second SSAD) ("Although KBR proposed [ * * * ]% lower salary for the Project Manager and KBR proposed lower salaries for at least three of their professional employees, their proposed compensation was still within the range of similarly situated professionals in the commercial marketplace as evidenced by their supporting data."). Accordingly, EGS's contention amounts to mere disagreement with the Agency's judgment, and this argument fails. *See, e.g.*, *Banknote*, 56 Fed. Cl. at 384.[45]

Next, EGS argues that DLA never "considered whether KBR's proposed personnel are considered professional employees and thus exempt from the SCA." Pl. MJAR at 35. The Court fails to understand this argument. EGS provides no support for that assertion — either legal or factual (in the administrative record) — and, in any event, FAR 52.222-46 does not require agencies to independently verify whether an offeror's proposed professional employees are exempt from the SCA. The Court also agrees with KBR that EGS does not identify any specific labor position that the Agency allegedly misidentified. KBR Resp. at 19. This argument is not well developed or supported, and the Court rejects it.

EGS next asserts agency error related to KBR's putative plan to hire at least some professional employees directly from EGS. Pl. MJAR at 35–36 ("DLA failed to consider the inherent risk associated with hiring incumbent employees. . . . DLA's evaluation of KBR's professional employees that it proposed to hire from EGS is . . . arbitrary and capricious[.]"). EGS provides no support from the administrative record for EGS's assertion that KBR plans to hire EGS's professional employees. *Id.* Further, both the government and KBR flatly dispute the claim. Def. Resp. at 16 ("KBR did not, as EGS contends, propose hiring any of *EGS's* professional employees[.]"); KBR Resp. at 21 ("KBR's plan does *not* rely on hiring EGS professional employees; KBR has been independently recruiting to fill its two open positions.").

The Court finds, as a factual matter, that the government and KBR are correct. *See* AR 3574 (KBR's Corrected TCP) ("Our proposed professional service employees are current KBR employees . . . who are ready to start the transition period work immediately to ensure uninterrupted program continuity. *To fill the two new hire*

---

[45] If EGS intends this argument to mean that the Agency should have lowered KBR's Technical rating because of KBR's TCP, the Court agrees with KBR that this claim "improperly conflates the Technical and Price factors." KBR Resp. at 19.

*positions, we are currently conducting interviews* to identify, hire, and prepare our new support personnel to join the transition effort." (emphasis added)).[46]  Accordingly, this argument regarding KBR's hiring plan is also baseless.[47]

Finally, EGS contends that "DLA only considered KBR's base year salary rates" and "arbitrarily failed to . . . evaluate the salary reduction each year of the contract."  Pl. MJAR at 38 (citing only "Tab 104" of the administrative record, the 21-page Second PET Report).  EGS argues this putative failure matters because "an agency may not consider professional salary in just the base year but must also consider all periods of performance."  Pl. MJAR at 38 (citing in support only two GAO decisions, *SURVICE Eng'g*, B-414519, 2017 CPD ¶ 237, 2017 WL 3309909 (Comp. Gen. July 5, 2017), and *L-3 Nat'l*, B-411045, 2016 CPD ¶ 233, 2015 WL 12631232 (Comp. Gen. Apr. 30, 2015)).

Once again, the Court finds that the record disproves EGS's assertion.  While the Second PET Report to which EGS cites includes a chart focusing only on "total annual compensation for year 1 of the contract," the *same page of the report* also notes that: (1) "KBR provided total annual compensation for all five years"; and (2) "[w]hile not included in the narrative, KBR has applied an average of [ * * * ]% escalation for each year; specifically [ * * * ]% from year 1 to year 2, [ * * * ]% from year 2 to year 3, [ * * * ]% from year 3 to year 4 and [ * * * ]% from year 4 to year 5."  AR 4074.  In other words, DLA did exactly what EGS claims the Agency should have done — DLA "consider[ed] all periods of performance" when evaluating salary.  Pl. MJAR at 38.  This claim, like the others, is meritless.

---

[46] EGS may be confusing professional and non-professional staff.  *See* AR 1753 (KBR Proposal) (noting that "KBR plans to retain at least [ * * * ]% of the current field technicians").  Technicians are non-professional employees.

[47] EGS relatedly argues that DLA arbitrarily and capriciously evaluated the "professional employees that [KBR] proposed to hire from EGS" because KBR proposed "massive salary reductions" for those employees.  Pl. MJAR at 36–37 (comparing proposed salaries for the Logistician II position).  This argument is derivative of EGS's factually inaccurate claim that KBR proposed to hire professional employees from EGS.  The argument would fail even if it did not rely on this premise, however, because:  (1) KBR's proposed Logistician II salary was above the median salary for the position reported in [ * * * ]; and (2) EGS's proposed salary for the position was [ * * * ] than the median.  AR 3519 (reporting a median Logistician II salary of $[ * * * ]).  The record, therefore, provides adequate support for DLA's evaluation of KBR's professional employees.

### D. The Government Conducted a Valid Price Realism Analysis of KBR's Proposed Non-Professional Employees (Count Four)

In Count Four, EGS asserts that the Agency failed to conduct a proper price realism analysis of KBR's proposed non-professional employees, contrary to the requirements of Section M.3.5 of the Solicitation.  Compl. ¶¶ 138–58; Pl. MJAR at 38–40. The Court agrees that Section M.3.5 required some sort of price realism analysis, but the Court holds that the Agency's analysis was sufficient.  Accordingly, Count Four fails.

As described above, agencies conduct price realism analyses to ensure that offerors' prices are not so low as to threaten contract performance.  *See, e.g.*, *Asset Prot. & Sec. Servs*, 5 F.4th at 1363; *DMS All-Star*, 90 Fed. Cl. at 663.

This Court has observed that "the FAR is silent on how to conduct a price realism analysis." *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 530 (2007). Accordingly, the terms of a solicitation dictate how an agency is to conduct a price realism analysis — and when a solicitation does not mandate a particular method, this Court reviews an agency's chosen methodology with substantial deference.  *See, e.g.*, *Ala. Aircraft Indus., Inc. – Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009) ("[A] trial court's duty [i]s to determine whether the agency's price-realism analysis *was consistent with the evaluation criteria set forth in the RFP*, not to introduce new requirements outside the scope of the RFP." (emphasis added) (citation omitted); *Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 404 (2015) (leaving a price realism analysis's "methodology . . . to the agency's discretion" when "the RFP did not make any commitments to perform a price realism analysis in any particular manner"); *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 358 ("[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation."); *Med. Matrix, LLP v. United States*, 2007 WL 5161789, at *9 (Fed. Cl. Dec. 12, 2007) (holding that price realism analyses generally are "committed to agency discretion and . . . '[this court] will not disturb such an analysis unless it lacks a reasonable basis'" (alteration in original) (quoting *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 9 (2000))).

Section M.3.5 of the Solicitation provides, in relevant part:

> Proposals which are unrealistic in terms of technical or schedule commitments, *or unrealistically high or low* in terms of cost, may be deemed reflective of an inherent lack of technical competence, or indicative of a failure to comprehend the complexity of risks of the proposed work and *may be grounds for rejection of the proposal*.

AR 637 (emphasis added); *see also* Pl. MJAR at 38 (quoting this portion of AR 637); Compl. ¶ 139 (same).

This Court has held that similar language requires an agency to conduct a price realism analysis. *See Rotech Healthcare*, 121 Fed. Cl. at 403–04 (holding that a solicitation containing the phrase "[u]nrealistically low proposed prices may be grounds for eliminating a proposal" required some "consideration of realism"); *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 349, 357–59 (holding that a solicitation requiring an agency to "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach" and noting that proposals with "an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration" required a price realism analysis); *Med. Matrix, LLP*, 2007 WL 5161789, at *9 (holding that an agency "acted rationally in making [a] price realism determination" when the solicitation "indicate[d] that '[p]roposals that are . . . unrealistically high or low in cost will be deemed reflective of an inherent lack of technical competence or indicative of a failure to comprehend the proposed requirements and will be rejected'" (second alteration in original)).

Accordingly, the Court agrees with EGS that Section M.3.5 of the Solicitation required DLA to conduct a price realism analysis.

The Court finds, however, that DLA's price realism analysis was consistent with the Solicitation's terms. The Agency: (1) compared KBR's price to that of EGS and the IGCE, AR 4061 (Second PET Report), AR 3611–13 (Second SSAD); (2) reviewed the cost of each CLIN, AR 3611; and (3) sought and received additional details regarding KBR's price proposal — to verify that KBR understood the technical requirements — during negotiations, AR 3623–24 (PNM). This Court has approved far less rigorous analyses as valid price realism evaluations under similar solicitation language. *See, e.g., Rotech Healthcare*, 121 Fed. Cl. at 404 ("[The agency] evaluated the realism of [the awardee's] price by comparing its total price to all other offers and the IGCE. This court and the GAO have recognized that comparing line items of different offers is a valid way to determine price realism."). In sum, the Court holds that DLA had "a reasonable basis" for its price realism methodology, *see Med. Matrix, LLP*, 2007 WL 5161789, at *9, and therefore holds DLA's analysis constituted a reasonable price realism evaluation pursuant to Section M.3.5.

EGS makes two arguments to the contrary, both of which this Court rejects.

*First*, EGS asserts that DLA mistakenly analyzed three elements of KBR's proposal under its price realism analysis that are actually elements of a price

reasonableness analysis:  (1) KBR's plan to be proactive in retaining incumbent non-professional staff; (2) KBR's plan to ensure job coverage to job sites where new employees are waiting for access cards by [ * * * ] who have access cards; and (3) KBR's plan to [ * * * ] its technicians.  Pl. MJAR at 39; Compl. ¶ 144–47.

The administrative record demonstrates, however, that DLA thoroughly analyzed the first two elements with an eye towards performance risk — an aspect of price realism.  *See DMS All-Star*, 90 Fed. Cl. at 663.  For example, the TET Report notes that DLA initially assessed KBR a weakness for its plan to hire the incumbent workforce and ensure new hires obtained a common access card.  AR 2556.  The TET Report explained, however, that KBR's revised proposal contained more detail — leading the TET ultimately to conclude that "[t]his level of sufficient detail demonstrates that KBR *has an adequate understanding of the requirements and will be able to . . . meet the requirements* of PWS Section 5.1.1."  AR 2557 (emphasis added).  DLA, therefore, *did* evaluate KBR's understanding of the "complexity of risks of the proposed work."  AR 637 (§ M.3.5).

The record also shows that DLA evaluated the third element, the viability of KBR's proposed [ * * * ] of technicians, precisely to verify that KBR's proposed price was not too low, which is the purpose of a price realism analysis.  *See* AR 3623–24 (PNM) (noting, *inter alia*, that the TET analyzed KBR's technician [ * * * ] plan in response to agency concerns about KBR's low price and found the plan "to be acceptable since the solicitation did not require technicians to be at [ * * * ]"); *DMS All-Star*, 90 Fed. Cl. at 657 n.5 ("At the risk of over-simplification, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work").  On this record, the Court finds DLA's conclusion reasonable.

*Second*, EGS argues that the government failed to consider the risks in KBR's proposal regarding proposed wages for non-professional employees.  Pl. MJAR at 39.  EGS maintains that KBR proposed paying wages "that are below market rates," while EGS proposed paying [ * * * ]% "[ * * * ]than the SCA rates."  *Id.*  According to EGS, DLA "never considered the risk associated with KBR's proposed plan to pay on average [ * * * ]."  *Id.* at 39–40.

Again, however, the Court notes that "the nature and extent of a price realism analysis is ultimately within the . . . agency's discretion," *Afghan Am. Army Servs. Corp.*, 90 Fed. Cl. at 358, and the Court finds DLA's price realism analysis reasonable and acceptable pursuant to Section M.3.5.  EGS's argument fails to persuade this Court otherwise, particularly in light of the fact that EGS and KBR proposed total labor costs within $[ * * * ] of each other.  *Compare* AR 2465 (showing that KBR proposed $[ * * * ] for labor), *with* AR 1542 (showing that EGS proposed $[ * * * ] for labor). *See also* AR 2369

(KBR Response to ENs) (noting that KBR's "compensation package offers pay at the current levels or higher" for non-professional employees).

Given that the Court has determined that the government and KBR are entitled to judgment on Counts One, Two, Three, and Four of EGS's complaint, the Court holds that Counts Five, Six, and Seven similarly fail. *See* Compl. ¶¶ 159–65 (Count Five) (alleging that DLA conducted an improper best value analysis); *id.* ¶¶ 166–72 (Count Six) (requesting permanent injunctive relief); *id.* ¶¶ 173–75 (requesting a declaratory judgment).

## *CONCLUSION*

For the above reasons, the Court **GRANTS** EGS's motion to supplement the Court's record, and further **GRANTS** Defendant's and Defendant-Intervenor's respective motions for judgment on the administrative record. The Court **DENIES** Plaintiff's motion for judgment on the administrative record.

Accordingly, the Clerk is directed to enter **JUDGMENT** for Defendant and Defendant-Intervenor.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge